No. 2013-1205

# United States Court of Appeals
## FOR THE FEDERAL CIRCUIT
_____

GABRIEL TECHNOLOGIES CORPORATION
AND TRACE TECHNOLOGIES, LLC,

*Plaintiffs-Appellants*,

v.

QUALCOMM INCORPORATED,
SNAPTRACK, INC., AND NORMAN KRASNER,

*Defendants-Appellees*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
IN CASE NO. 08-CV-1992, JUDGE ANTHONY J. BATTAGLIA

## BRIEF OF PLAINTIFFS-APPELLANTS
## GABRIEL TECHNOLOGIES CORPORATION
## AND TRACE TECHNOLOGIES, LLC

CHAPIN FITZGERALD LLP
  KENNETH M. FITZGERALD
  ROBERT G. KNAIER
  KEITH M. COCHRAN
550 West C Street, Suite 2000
San Diego, CA 92101
Telephone:  (619) 241-4810
Facsimile:  (619) 955-5318

*Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Plaintiffs-Appellants certifies the following:

1.      **The full name of every party or amicus represented by counsel is:**

Gabriel Technologies Corporation; and Trace Technologies, LLC.

2.      **The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by counsel is:** None.

3.      **All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by counsel are:** Trace Technologies, LLC is a wholly owned subsidiary of Gabriel Technologies Corporation.

4.      **The names of all law firms and the partners or associates that appeared for the party or amicus now represented by counsel in the trial court or agency or are expected to appear in this court are:** Gregory M. Williams, Peter A. Sullivan, Ronald Abramson, and Michael E. Salzman of Hughes Hubbard & Reed LLP; John D. Van Loben Sels of Wang Hartmann Gibbs & Cauley PLC; Brian C. Gonzalez of the Law Offices of Brian Gonzalez; Kenneth Fitzgerald, Robert Knaier, and Keith Cochran of Chapin Fitzgerald LLP; and Jamil N. Alibhai of Munck Carter LLP.

Dated:    August 9, 2013          By:    /s/ Kenneth M. Fitzgerald
                                          Kenneth M. Fitzgerald

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................i

TABLE OF AUTHORITIES ....................................................... iii

STATEMENT OF RELATED CASES ....................................1

STATEMENT OF JURISDICTION........................................1

STATEMENT OF THE ISSUES................................................1

STATEMENT OF THE CASE ....................................................2

STATEMENT OF THE FACTS ...................................................5

    A.     The Business Relationship ........................................5

    B.     The Bond Ruling .......................................................7

    C.     The Trade Secret Designations .................................9

    D.     The Trade Secret Ruling .........................................11

    E.     The Inventorship Ruling.........................................14

    F.     The Attorneys' Fee Award......................................14

SUMMARY OF THE ARGUMENT ....................................17

ARGUMENT ...........................................................................21

I.     The District Court Erred in Finding this Case "Exceptional"
Under the Patent Act, and Thus Abused Its Discretion in
Awarding Attorneys' Fees.......................................................21

    A.     Standard of Review ................................................21

    B.     This Case Is Not Exceptional Under the Patent Act ...........23

        1.     The Court Erred in Finding Plaintiffs' Claims
Objectively Baseless ........................................24

            a.     Plaintiffs Supported Their Claims with Expert
Opinion ..................................................24

            b.     Plaintiffs Submitted Substantial Evidence of
Inventorship .................................................26

    c. Sophisticated Entities Supported Plaintiffs' Claims After Performing Substantial Due Diligence ........................................................30

  2. The Court Erred in Finding Subjective Bad Faith ...................31

    a. The Court Disregarded Facts Consistent with Plaintiffs' Good Faith Belief in Their Claims ...............33

    b. The Court Erroneously Adopted a Distorted and Incorrect View of the Evidence ...............................34

  3. The Court Erred in Finding that Plaintiffs Engaged in Litigation Misconduct............................................37

II. The District Court Abused Its Discretion in Awarding Fees Under California's Uniform Trade Secrets Act..............................................40

 A. Standard of Review ...........................................................40

 B. Plaintiffs Asserted and Maintained Their Trade Secret Claims in Good Faith .........................................................40

  1. The Court Erred in Finding Objective Speciousness................41

  2. The Court Erred in Finding Subjective Bad Faith ...................44

    a. The Court Disregarded Evidence of Good Faith .............................................................................44

    b. The Court Erroneously Relied on an Incorrect Prior Ruling .................................................45

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ...............................49

CERTIFICATE OF COMPLIANCE.....................................................................50

CERTIFICATE OF SERVICE ..............................................................................51

ADDENDUM:  Order Granting Motion for Attorneys' Fees (Docket No. 371)

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*,
 605 F.3d 1305 (Fed. Cir. 2010) ..........................................................47

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
 682 F.3d 1003 (Fed. Cir. 2012) ..........................................................24

*Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*,
 393 F.3d 1378 (Fed. Cir. 2005) ..............................................22, 23, 32

*CRST Van Expedited, Inc. v. Werner Enters., Inc.*,
 479 F.3d 1099 (9th Cir. 2007) .......................................................40, 48

*Davis v. Uke*,
 27 U.S.P.Q.2d 1180 (B.P.A.I. 1993) ...................................................29

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
 567 F.3d 1314 (Fed. Cir. 2009) ..........................................................22

*Dominant Semiconductors Sdn. Bnd. v. Osram GmbH*,
 524 F.3d 1254 (Fed. Cir. 2008) ..........................................................32

*Eon-Net LP v. Flagstar Bancorp.*,
 653 F.3d 1314 (Fed. Cir. 2011) ..........................................................38

*FieldTurf Int'l, Inc. v. Sprinturf, Inc.*,
 433 F.3d 1366 (Fed. Cir. 2006) ..........................................................22

*Forest Labs., Inc. v. Abbott Labs.*,
 339 F.3d 1324 (Fed. Cir. 2003) ..........................................................22

*Highmark, Inc. v. Allcare Health Mgm't Sys.*,
 687 F.3d 1300 (Fed. Cir. 2012) ..............................................22, 24, 30

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
 558 F.3d 1380 (Fed. Cir. 2009) ..........................................................38

*Idaho Watersheds Project v. Jones*,
 253 Fed. Appx. 684 (9th Cir. 2007)......................................................25

*iLOR, LLC v. Google, Inc.*,
 631 F.3d 1372 (Fed. Cir. 2011) ......................................22, 23, 32, 38

*Mathis v. Spears,*
  857 F.2d 749 (Fed. Cir. 1988) ...............................................................38

*Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH,*
  603 F.3d 943 (Fed. Cir. 2010) ........................................................22, 25

*Old Reliable Wholesale, Inc. v. Cornell Corp.,*
  635 F.3d 539 (Fed. Cir. 2011) .............................................21, 22, 23, 37, 38

*Reactive Metals and Alloys Corp. v. ESM, Inc.,*
  769 F.2d 1578 (Fed. Cir. 1985) ...........................................................39

*Stephens v. Tech Int'l, Inc.,*
  393 F.3d 1269 (Fed. Cir. 2004) .....................................................22, 39

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.,*
  587 F.3d 1339 (Fed. Cir. 2009) ...........................................................40

*Union Pacific Resources Co. v. Chesapeake Energy Corp.,*
  236 F.3d 684 (Fed. Cir. 2001) ...........................................................26

*Wedgetail Ltd. v. Huddleston Deluxe, Inc.,*
  576 F.3d 1302 (Fed. Cir. 2009) ...........................................................21

**State Cases**

*Advanced Modular Sputtering, Inc. v. Superior Court,*
  132 Cal. App. 4th 826 (Cal. Ct. App. 2005).............................................43

*FLIR Sys. Inc. v. Parrish,*
  174 Cal. App. 4th 1270 (Cal. Ct. App. 2009)............................20, 40, 41, 44, 48

*Gemini Aluminun Corp. v. California Custom Shapes, Inc.,*
  95 Cal. App. 4th 1249 (Cal. Ct. App. 2002)..............................20, 40, 41, 46, 48

*SASCO v. Rosendin Elec., Inc.,*
  207 Cal. App. 4th 837 (Cal. Ct. App. 2012)................................................40, 41

**Federal Statutes and Rules**

28 U.S.C. § 1295(a)(1) ...............................................................................1

28 U.S.C. § 1927 .......................................................................................38

28 U.S.C. § 1338........................................................................................1

35 U.S.C. § 285 ...................................................................................1, 2, 21

**State Statutes and Rules**

Cal. Civ. Code § 3426.4 ..........................................................................2, 40

## STATEMENT OF RELATED CASES

Two appeals currently before this Court, *Gabriel Technologies Corp. v. Qualcomm Incorporated,* No. 13-1058, and *Gabriel Technologies Corp. v. Qualcomm Incorporated*, No. 13-1211, arose from the same civil action as this appeal.  Counsel is unaware of any other case pending in this Court or any other court that will directly affect or be affected by this appeal.

## STATEMENT OF JURISDICTION

The district court had original jurisdiction under 28 U.S.C. § 1338 based on claims arising under an Act of Congress related to patents.  On September 28, 2012, the district court entered final judgment in favor of Defendants-Appellees Qualcomm Incorporated ("Qualcomm"), SnapTrack, Inc. ("SnapTrack"), and Norman Krasner ("Krasner") (collectively, "Defendants").  The district court awarded attorneys' fees to Defendants on February 1, 2013, and Plaintiffs-Appellants Gabriel Technologies Corporation ("Gabriel") and Trace Technologies, LLC ("Trace") (collectively, "Plaintiffs") timely filed a notice of appeal on February 14, 2013.  This Court therefore has jurisdiction over this appeal under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.    Did the district court err in finding this case "exceptional," and thus abuse its discretion in awarding attorneys' fees under the Patent Act (35 U.S.C. §

285), where the evidence—including the opinions of well-credentialed expert witnesses; Plaintiffs' identification of their contributions to the patents at issue; and the substantial investment in of time, effort, and money in the case by sophisticated outside entities—was sufficient both to provide a reasonable litigant with a reasonable expectation of success on the merits, and to demonstrate Plaintiffs' good faith belief in such success?

2.    Did the district court abuse its discretion in awarding attorneys' fees under California's Uniform Trade Secret Act (Cal. Civ. Code § 3426.4), where the evidence—including the survival of several causes of action through multiple rounds of motions practice, Plaintiffs' repeated articulation of the nature of the trade secrets at issue, supporting opinions of four expert witnesses, Plaintiffs' posting of an extraordinary $800,000 bond, and a private equity fund's substantial debt-investment in the case—was sufficient to show both that the case had merit and that Plaintiffs brought and maintained it in good faith?

## STATEMENT OF THE CASE

Plaintiffs appeal from the district court's extraordinary award of over $12 million in attorneys' fees under the Patent Act and California's Uniform Trade Secret Act ("CUTSA").  In a separate appeal (No. 2013-1058), Plaintiffs assert that the district court committed material errors of law on the merits, and incorrectly disposed of the case though its summary judgment rulings.  This brief addresses

why a fee award would be inappropriate even if the summary judgment orders were to be upheld on the merits. The discussion herein thus addresses the hypothetical scenario in which the district court's merits determinations are affirmed. The mere making of these arguments should not be taken as conceding any issues on the merits. Reversal on the merits—which Plaintiffs submit is necessary—would of course obviate any basis for the fee award.

Plaintiffs Gabriel and Trace are corporate successors of Locate Networks LLC ("Locate"), a technology company formed in 1999 to develop a portable, low-power Global Positioning System ("GPS") tracking device. Locate entered into a license agreement in 1999 with Defendant SnapTrack. Defendant Qualcomm later acquired SnapTrack. Plaintiffs allege that in the years that followed, Defendants took trade secret information from Plaintiffs and used that information to apply for patents in the names of Defendants' employees.

In October 2008, Plaintiffs brought this action for misappropriation of trade secrets, breach of contract, and correction of inventorship. A206-41; *see also* A624-56.[1] In September 2010, after resolving several pleading challenges, the

---

[1] Citations to "A___" are to the joint appendix being prepared in No. 2013-1058, which appendix will be filed with the Court upon completion of briefing in both appeals, as required by Rule 30 of the Federal Circuit Rules. *See* Docket No. 12 (the Court's June 10, 1013 order granting Plaintiffs' unopposed motion to, *inter alia*, consolidate this appeal with No. 2013-1058 and permit the parties to this appeal to cite to the appendices used in No. 2013-1058).

district court ordered Plaintiffs to post an $800,000 bond as security for

Defendants' costs and attorneys' fees.  A2400-23.  In December 2010, Plaintiffs

posted the $800,000 bond.  A2435-45.

Thereafter, four well-credentialed experts provided opinions and detailed

analyses supporting Plaintiffs' claims, and Plaintiffs filed several motions to

compel discovery responses, because Defendants' continued to refuse to provide

information relevant to Plaintiffs' claims.  A2447-48; A3726-37; A3762-75;

A3826-27.  The magistrate judge initially was inclined to find that Plaintiffs had

adequately designated at least one trade secret.  A4943:14; A4944:12-23;

A4945:23; A4972:19-22.  However, notwithstanding Plaintiffs' expert evidence,

the magistrate ultimately found that Plaintiffs had not designated their trade secrets

sufficiently to allow for discovery on their trade secret claims.  A3680-81; A3760-

61; A3778-79; A5284-92.  Plaintiffs have separately appealed that ruling.  *See*

Brief of Plaintiffs-Appellants in No. 2013-1058, at 51-61.

In March 2012, the district court granted Defendants' partial motion for

summary judgment as to Plaintiffs' trade secret claims and trade secret-based

breach of contract claims.  A28-49.  In October 2012, the court granted

Defendants' motion for summary judgment as to Plaintiffs' inventorship claims

and related breach of contract claims.  A2-14.  Plaintiffs have separately appealed

each of those summary judgment rulings.  *See* Brief of Plaintiffs-Appellants in No.

2013-1058, at 34-51, 61-76.  Defendants then moved for an award of attorneys'
fees under the Patent Act and CUTSA.  The court awarded Defendants
$12,401,014.51 in fees against Plaintiffs and $64,316.50 in fees against Plaintiffs'
local counsel.  A9670-90.  Plaintiffs now appeal the district court's award of
attorneys' fees.

## STATEMENT OF THE FACTS

### A.    The Business Relationship

This action arose out of events related to technology licenses and the course
of dealing between Plaintiffs (and their predecessor in interest) and Defendants.  In
late 1998 and early 1999, William Clise and Richard Crowson founded Locate,
Gabriel's predecessor in interest.  A2084 (filed under seal) ¶ 6.  Clise and Crowson
were entrepreneurs with a track record of successfully building high-technology
companies from scratch.  A2083-84 (filed under seal) ¶¶ 3-5.  Locate's objective
was to create location-based services, using a pager network.  A2084 (filed under
seal) ¶¶ 6-8.  Locate wanted to develop pagers and "tags" whose locations could be
determined wirelessly, allowing the tracking of persons or assets.  *Id.*; A3060 (filed
under seal) ¶ 42.  By mid-2000, Locate had over fifty employees, including thirty-
five engineers.  A2086 (filed under seal) ¶ 14.

Clise and Crowson conceived of these systems and of how existing GPS
technology, which was designed for use over cellular networks, could be adapted

5

to a paging infrastructure. *See* A6779-88. They hired engineers to create the architecture for the software and write the source code to implement the systems they had conceived. A9408 ¶ 14. By 2002, Locate had reduced its conceptions to practice and created test pagers whose locations could successfully be determined. *Id.* ¶ 15. Locate never became a profitable company, however, because its manufacturing partner abruptly left the paging business, and when the dot-com bubble burst, funding for start-up technology companies became scarce. *Id.*

In late 1998, Clise and Crowson had begun discussing development projects with SnapTrack. In August 1999, after many discussions and meetings, they entered into a license agreement. A2085 (filed under seal) ¶ 13; A9575 ¶ 4. The agreement allowed Locate to use SnapTrack's GPS software in exchange for paying licensing and royalty fees to SnapTrack, and provided for development work to be performed by SnapTrack based on detailed appended specifications. *See, e.g.*, A2085 (filed under seal) ¶ 13.

In March 2000, Qualcomm acquired SnapTrack. A2086 (filed under seal) ¶ 17. Before and after this acquisition, Locate held regular meetings with SnapTrack and Qualcomm to discuss development of the technology. A2086-87 (filed under seal) ¶¶ 17-18. Ultimately, Plaintiffs claim that between 1999 and 2006, Defendants misappropriated Plaintiffs' trade secrets and other confidential information and secretly filed and obtained numerous patents based on Locate's

6

technology. *See, e.g.*, A646 ¶ 111. Plaintiffs contend that software architecture and techniques in Plaintiffs' technical documents and disclosures can be traced forward to Qualcomm's later-filed patents. Plaintiffs thus filed suit in October 2008, asserting causes of action for misappropriation of trade secrets, breach of contract, and correction of inventorship. A206-41.

**B.    The Bond Ruling**

In September 2010, the district court (Judge Anello) ordered Plaintiffs to post an $800,000 bond as security for Defendants' costs and attorneys' fees. A2400-23. This was reported to be the largest such bond in California history. In requiring the bond, Judge Anello credited Defendants' arguments that Plaintiffs' claims lacked merit, and that Plaintiffs were somehow aware of this.

First, Judge Anello accepted Defendants' argument that Plaintiffs' trade secret claims were likely time-barred because the "statute began running as early as January 1, 1999[.]" A827:21-22; *see also* A2186:23-24; A2414:3-27. Specifically, Defendants contended that "Plaintiffs had reason to suspect Defendants were misusing Locate's technology and confidential information for their own benefit approximately nine years before Plaintiffs filed this action in late 2008." A2413:25-27. On this basis, Judge Anello found it possible that the statute of limitations was triggered when "Plaintiffs had reason to suspect Defendants

were misappropriating Locate's technology during the co-development period in 1999-2001." A2414:25-26.

Further, Defendants presented e-mails written by a former Gabriel director and a former employee, and contended that these e-mails showed that Plaintiffs did not believe in the merits of the case. As Defendants later argued in their motion for attorneys' fees, their request for a bond relied in large part on an e-mail from a former Gabriel board member stating, in part, "we have no case[,] [j]ust a lot of talk" (A7873:19-20); and an e-mail from a former employee, in part raising concerns about "the real value" of the case (A7873:23-24). Read in full, and in the light of explanatory declarations and testimony of their authors, however, these e-mails reflect the former director's frustrated that Gabriel's prior counsel was refusing to release documents and work product to support the litigation (A9593-98); and that the former employee simply believed that the "real value" of the case required his expertise—and that value would suffer because he was no longer with the company (A6006; A9526 ¶ 3; A9551:22 – A9555:6). Judge Anello nevertheless credited only Defendants' distorted interpretations of these e-mails, based on snippets of language in them read out of context, ultimately requiring that Plaintiffs post a sizeable bond. A2421-23.

Judge Anello had initially proposed that Plaintiffs post a bond of $100,000 - $150,000. A2422:2-3; A2347:11-21. Defendants strongly objected to a bond in

8

this range, arguing that the district court ultimately would deem the case

"exceptional" under the Patent Act, and thus Defendants would be entitled to

substantial attorneys' fees.  Indeed, Defendants argued that a larger bond should be

required so that "we end this case."  A2370:17-19.

Defendants repeatedly asserted that Plaintiffs would post a large bond only

"if it is a real case":

> And so my point . . . is to try and persuade you to issue a more significant
> bond because again, ***if it is a real case***, they'll post it.  If it's not, it should
> end now because . . . if the bond can't be posted, the case gets dismissed.

A2352:9-14 (emphasis added); *see also* A2353:11-12 ("And again, *if it's a real*

*case*, they'll be able to post it."); A2370:20-21 ("We ask that bond be issued,

knowing, again I'm being forthright, knowing they can't post it so that we end this

case.  Again, *if it's a real case*, they'll find a source to post it."); A2391:13-16

("To prevent a frivolous suit and to prevent it from going forward and I end where

I began, *if it's a real case*, they can post a sizable bond, your honor.").  In response

to these arguments, Judge Anello required that Plaintiffs post an $800,000 bond.

Plaintiffs then posted the bond, demonstrating that this was a "real case," with

perceived and actual merit.  A2435-45.

## C.     The Trade Secret Designations

Throughout the case, Defendants continuously refused to provide discovery,

claiming that Plaintiffs had not sufficiently identified their trade secrets under a

9

state procedural statute: section 2019.210 of the California Code of Civil

Procedure.  In an effort to work cooperatively with Defendants, Plaintiffs

voluntarily amended their trade secret designations four times before moving to

compel discovery.  A9412 ¶ 30.  Indeed, *after* Judge Anello expressed skepticism

about the merits of Plaintiffs claims in his 2010 bond ruling, Plaintiffs secured the

opinions of four experts—tenured professors at the University of California at

Berkeley, Carnegie Mellon, the University of Southern California, and Washington

University in St. Louis—stating that they understood Plaintiffs' trade secret

identifications and could compare the trade secrets to information known in the

field.  *See* A2899-2942 (Garlan Dec., filed under seal); A2943-3010 (Medvidovic

Dec., filed under seal); A3011-48 (Min Dec., filed under seal); A3049-87 (Sahai

Dec., filed under seal).  Plaintiffs then made several motions before Magistrate

Judge Dembin, seeking trade secret discovery.  A2447-48; A3726-37; A3762-75;

A3826-27.

　　Judge Dembin ultimately found Plaintiffs' trade secret identifications

inadequate under the state procedural statute.  A3680-81; A3760-61; A3778-79;

A5284-92.  Notably, however, even Judge Dembin viewed these rulings (which

Plaintiffs strongly dispute in their separate merits appeal) as close calls.  Indeed, at

a September 2011 hearing, Judge Dembin noted that Plaintiffs were very close to

articulating their trade secret claims: "I've read your trade secret designation

10

number one and I think I understand what it is. . . . ***this one makes sense to me***." A4944:12-23 (emphasis added); *see also* A4943:14 ("I think you're in good shape[.]"); A4945:23 ("Trade Secret 1 makes sense to me."); A4972:19-22 ("[Y]ou have at least made me think that you've crossed the barrier . . . with Trade Secret 1."). But after ordering further briefing, Judge Dembin ultimately ruled that Plaintiffs' trade secret designations were not sufficient, and that Plaintiffs would not be allowed to conduct discovery related to their trade secret claims. A5284-92. In doing so, Judge Dembin *did not* rule on the merits of those claims.

## D.     The Trade Secret Ruling

In March 2012, the district court (Judge Battaglia) granted partial summary judgment to Defendants on Plaintiffs' trade secret claims and trade secret-based breach of contract claims—without making any rulings on the merits. A28-49. The district court held that Plaintiffs' claims were "time barred if Plaintiffs suspected wrongdoing on or before December 17, 2004" (A35:1-2), and found that Plaintiffs suspected such wrongdoing in either January 2003 or mid-2004 (A35:12 – A42:7). In making these findings, the court relied on a statement made by former Locate Chief Technology Officer William Clise, and testimony of former Gabriel employee Maurice Shanley.

Specifically, the district court relied on an e-mail that Clise wrote in January 2003, and similar testimony, in which Clise stated that SnapTrack's "broadcast

mode for GSM looked like a direct rip-off of our work with Glenayre."  A4878:13-16.  Clise subsequently testified, however, that upon further review of the technology at issue, he was *mistaken* in his initial belief that SnapTrack was using technology developed by Locate.  A9526 ¶ 4; A9559:2 – A9560:7.  Indeed, Defendants *conceded* that Clise was "wrong" in his initial suspicion regarding SnapTrack's technology.  A4363:9 – A4364:4.  Thus, Clise's January 2003 suspicion was, in fact, unfounded—and further investigation of that suspicion provided no factual basis for suspecting a misappropriation of intellectual property.  The district court nevertheless found that "Clise suspected Defendants of misappropriation of a Locate trade secret in January 2003," thereby triggering the limitations period.  A36:7-8.

The district court also relied on Shanley's testimony concerning his renegotiation of the parties' license agreement in 2004 and 2005.  Although Shanley testified that Gabriel retained counsel in mid-2004, he explained that it did so to assist it in negotiating proposed changes to the parties' license agreement— and that only later did that counsel begin pursuing a potential claim for theft of trade secrets.  A9526 ¶ 5; A9565:12-24.  Shanley also testified that Gabriel retained Allan Angus, an engineer, to review whether any technology existed that had been jointly-developed by Locate and Snaptrack—which was the subject of one of the proposed license-agreement changes.  As Shanley explained, in late

12

2004 Mr. Angus reviewed the technology that Locate had developed, and then later, no earlier than February 2005, began comparing Locate's records to Defendants' patents.  A9566:18 – A9567:21.

Based on this timeline, Shanley testified that it was not until February, March, or perhaps even June of 2005 that he "had factual reason to believe that perhaps misappropriation had occurred."  A9568:21 – A9569:4.  Moreover, he stated that he would defer to Mr. Angus as to when the "determination" was made "that any intellectual property theft had occurred[.]"  A9570:25 – A9571:6.  In turn, Mr. Angus testified that he did not begin comparing Locate and Snaptrack technology until early 2005 (A9526 ¶ 3; A9539:2-14; A9540:3-17)—and that he did not conclude that certain "Locate technology appeared in Snaptrack patents," *i.e.*, that misappropriation may have occurred, until "the spring [or] summer of 2005" (*id.*; *see also* A9541:11-18).  Despite this evidence, the district court found that Shanley's testimony established that the limitations period may have been triggered in *mid-2004*.  A39:4 – A42:7.

Thus, although Judge Anello had earlier found—in the context of Defendants' 2010 request for a bond—that Plaintiffs' claims might have been time-barred as a result of events occurring in 1999-2001, the district court ultimately held—two years later—that those claims were time-barred as a result of events occurring in 2003-2004.

13

**E.     The Inventorship Ruling**

In October 2012, the district court granted summary judgment to Defendants on Plaintiffs' inventorship and related breach of contract claims.  A2-14.  Central to that ruling was the question of whether Plaintiffs had adequately named Locate employees as having contributed to the invention of certain intellectual property. Plaintiffs presented substantial argument and evidence on this issue.  *See* A6639-7735.  The court nevertheless found that Plaintiffs presented "changing declarations of who the true inventors" were.  A8:13; *see also* A8:4-12; A9:13-19; A10:10-20; A11:17-20.  Further, the court held that, given conflicting discovery responses and deposition testimony, Plaintiffs did not "demonstrate by clear and convincing evidence"—the *merits* standard under the Patent Act, not the standard applicable to *summary judgment* (*see* Brief of Plaintiffs-Appellants in No. 2013-1058, at 63)—that Locate employees had contributed to the intellectual property at issue.  A9:8-10; A10:3-4; A11:12-13; A12:17-18; A13:26-27.

**F.     The Attorneys' Fee Award**

Following the district court's grant of summary judgment, Defendants moved for an award of $13,465,331.01 in attorneys' fees under the Patent Act and CUTSA.  A7863-64.  Defendants relied heavily on Judge Anello's 2010 bond ruling in arguing that Plaintiffs' claims lacked merit, and that Plaintiffs believed as much.  *See, e.g.*, A7870:14-15 ("Judge Anello's conclusions were spot-on[.]").  As

they had before Judge Anello in their bond request, Defendants largely focused on

e-mails written by John Hall and Allan Angus to argue that Plaintiffs pursued their

claims in bad faith.  A7873:8-25.  In opposition, Plaintiffs showed, through a full

reading of the e-mails at issue, along with declarations and deposition testimony of

their authors, that they reflected only frustration with former counsel and concern

over *how* to show the value in Plaintiffs' case—not *whether* it had value.

A9495:22 – A9497:12.[2]

Indeed, the same misleading and distorted reading of these e-mails formed

the centerpiece of Defendants' argument at the January 2013 hearing on the fee

request.  *See* A9861:1 – A9862:20; *see also* A9929-43 (Defendants' Argument

Slides).[3]  And once again, Plaintiffs' demonstrated to the district court that

Defendants' interpretation of those e-mails unreasonably disregarded the context in

which they were written *and* further evidence directly contrary to Defendants'

---

[2]   Indeed, given the extent to which Defendants distorted the meaning of these e-mails, Plaintiffs moved to exclude them from evidence.  *See* A9518-24.  The district court overruled Plaintiffs' evidentiary objections with little comment or analysis.  *See* A9676 n.2.

[3]   Also at the hearing—and throughout this case—Defendants employed *ad hominem* attacks against Plaintiffs, referring to them as "frauds," "disreputable characters," and "bad actors" (A9607:5, 13-14; A9616:23; A9880:1-3; A9992-93); and asserting that Gabriel is "not a real company" (A9858:2-3).  On the contrary, from the start, Plaintiffs employed engineers and pursued legitimate businesses, and had never—notwithstanding what Defendants appear to insinuate—pursued intellectual property litigation for its own sake (as a "patent troll" might).  *See* A9574 ¶¶ 1-3.

15

view. *See* A9888:7 – A9889:25; *see also* A9944-94 (Plaintiffs' Argument Slides).

The district court adopted Defendants' view of the evidence. In doing so, the court acknowledged that Defendants' burden under the Patent Act was to "establish by clear and convincing evidence that the case is 'exceptional.'" A9673:8-9 (citation omitted). The court then, however, heavily relied on little more than "Judge Anello's analysis in his bond decision" to conclude that Defendants had met that burden. A9675:1-2. Indeed, the court awarded $12,401,014.51 in fees on the basis that this was the amount that Defendants incurred since the bond ruling. A9670-90.

The district court's own analysis, however, failed to support a finding of clear and convincing evidence that Plaintiffs' acted in bad faith. Indeed, in support of a finding that "clear and convincing" evidence warranted an award of attorneys' fees under the Patent Act, the court repeatedly stated that certain evidence, including the e-mails noted above, merely "*suggest[ed]* that Plaintiffs knew they lacked the requisite evidence and opted to pursue their claims nonetheless" (A9675:28 – A9676:1, emphasis added), "*suggest[ed]*" that Plaintiffs did "not have the necessary evidence to bring their claims" and "were aware of the evidentiary deficiencies" (A9676:9-10, emphasis added), "*suggest[ed]* that [certain] documents were not the evidentiary key to Plaintiffs' claims that Plaintiffs represent them to be" (A9676:16-17, emphasis added), and "*suggest[ed]* that

16

Plaintiffs knew there was no evidentiary basis for their claims in early 2010"
(A9676:19-20, emphasis added). These *suggestions*, however, were the product of
Defendants' failure to view the evidence in its entirety—and were sufficiently
disproven by Plaintiffs' submissions to the court.

The district court's analysis of the fee award under CUTSA similarly relied
on less-than-compelling evidence. The court held that "Plaintiffs'
misappropriation claims were objectively specious and Plaintiffs brought and
maintained their claims in subjective bad faith." A9680:25-26. But in support of
this conclusion, the court relied, in part, on Judge Dembin's earlier rulings that
Plaintiffs had not sufficiently designated their trade secrets for *discovery* purposes.
A9681:9-10. The court further relied on Judge Anello's finding that Plaintiffs'
claims may have been time-barred by events occurring in 1999-2001 (A9681:10-
11; A9681:28 – A9682:5)—notwithstanding the court's own later finding that
those claims were time-barred by events occurring in 2003-2004 (A35:12 –
A42:7). As discussed below, the court's reliance on these prior rulings was
misplaced.

## SUMMARY OF THE ARGUMENT

The $12 million sanction must be reversed. The linchpin for the district
court's award of attorneys' fees was its determination that Plaintiffs had no basis to
pursue their inventorship and trade secret claims after the bond ruling. In the

district court's view, when Judge Anello predicted in 2010 that Defendants might prevail and recover their attorneys' fees, Plaintiffs should have dismissed the case. However, Judge Anello's early-stage bond ruling became a self-fulfilling prophecy—as the district court became unwilling to consider any contrary evidence.

To award fees under the Patent Act, the district court was required to find by *clear and convincing evidence* that Plaintiffs' inventorship claims were objectively baseless and brought in subjective bad faith.  At the core of the court's disposition was its assertion that Plaintiffs "continued with their claims despite [the bond ruling's] clear indication that there was a serious lack of evidence regarding Plaintiffs' patent claims."  A9677:15-16.  At least three critical pieces of evidence, however, demonstrated both the objective merit of Plaintiffs' claims—*i.e.*, that a reasonable litigant would reasonably have expected success—and Plaintiffs' good faith—*i.e.*, that Plaintiffs did in fact believe in their claims:

(1)    Highly-credentialed experts confirmed—*after the 2010 bond ruling*—that Locate had conceived of valuable contributions to the technology that was later included in Defendants' patents.

(2)    Plaintiffs posted an unprecedented $800,000 bond to continue the litigation.  As Defendants' counsel stated at the bond hearing: "[I]f it is a real case, they'll post it."  Plaintiffs believed, and, as evidenced by their appeal of the district court's erroneous summary judgment rulings, still believe, that this is a "real case."

(3)    After performing substantial due diligence, sophisticated outside entities supported this case with their their time, effort, and money.

18

>Indeed, Plaintiffs' trial counsel performed nearly 300 hours of due diligence before agreeing to pursue Plaintiffs' claims for a contingent fee—and, *after the bond ruling*, an intellectual-property private equity fund conducted its own extensive due diligence before providing $3.1 million in funding for the case.  This support, and its underlying due diligence, is further evidence of the merits of Plaintiffs' claims—and reinforced Plaintiffs' good-faith belief in those claims.

The district court simply failed to credit or explicitly consider this evidence.

The district court further erred in awarding fees under the Patent Act by disregarding evidence that Plaintiffs offered in support of their inventorship claims. The court found that Plaintiffs "could not have reasonably expected success on the merits of the patent claims without knowing the identify [sic] of the allegedly omitted inventors."  A9675:3-5.  But Plaintiffs consistently maintained throughout the litigation that Locate employees and engineers developed the trade secrets that were incorporated into Defendants' patents, identified omitted inventors for all patents at issue—and provided substantial evidence in opposition to Defendants' motion for summary judgment.

For similar reasons, the district court erred in awarding fees under CUTSA. The court found Plaintiffs' claims "objectively baseless" on the basis of its finding that Plaintiffs were never able to "articulate the alleged trade secrets" (A9682:14); and that Judge Anello previously found their claims likely time-barred.  Each of these findings is flawed.  Plaintiffs supported the articulation of their trade secrets with the opinions of four highly-qualified expert witnesses.  Plaintiffs are

separately appealing the merits of Judge Dembin's ruling that precluded trade secret discovery. Nevertheless, taking that ruling at face value, the record shows that even Judge Dembin believed Plaintiffs' attempts to articulate their trade secrets were in good faith; indeed, he initially concluded that Plaintiffs had *successfully* identified protectable trade secrets. Thus, even if this Court were ultimately to uphold Judge Dembin's rulings, this was not an instance in which there was "a complete lack of evidence to support [Plaintiffs'] claim[s]." *Gemini Aluminum Corp. v. California Custom Shapes, Inc.,* 95 Cal. App. 4th 1249, 1261 (2002).

Further, the district court's reliance on Judge Anello's preliminary evaluation of the timeliness of Plaintiffs' claims was inappropriate. Although Judge Anello's bond ruling predicted that Defendants would prevail, the factual findings underlying that ruling were never borne out. The 2010 bond ruling found the trade secret claims time-barred because the limitations period began to run as early as January 1, 1999. A2414:24-26. The district court's 2012 partial summary judgment ruling, however, found the trade secret claims time-barred due to events occurring in 2003 or 2004. A35:12 – A42:7. Thus, this is not an instance in which Plaintiffs moved forward "after the action's fatal shortcomings [were] revealed[.]" *FLIR Sys. Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1276 (2009). Whether events occurring in 2003 or 2004 rendered their claims untimely was *not decided until*

20

*2012*.  Moreover, even the district court's 2012 ruling regarding the timeliness of Plaintiffs' claims failed to demonstrate bad faith.  In holding that Plaintiffs' claims were time-barred, the court failed to acknowledge contested and contrary evidence—evidence that provided Plaintiffs with a good-faith belief that their claims were timely.

Therefore, because the district court failed to sufficiently credit evidence supporting both the merits of Plaintiffs' claims and Plaintiffs' subjective good faith belief in the merits of those claims, it abused its discretion in awarding fees under both the Patent Act and CUTSA.

## ARGUMENT

I. **The District Court Erred in Finding this Case "Exceptional" Under the Patent Act, and Thus Abused Its Discretion in Awarding Attorneys' Fees**

A. **Standard of Review**

Under the Patent Act, a district court may "award attorney fees to a prevailing party . . . if it determines that the case is 'exceptional.'"  *Old Reliable Wholesale, Inc. v. Cornell Corp.*, 635 F.3d 539, 543 (Fed. Cir. 2011) (quoting 35 U.S.C. § 285).  This Court has recognized, however, that such fee awards are, themselves, "an exception to the so-called 'American Rule,'" under which parties are expected to bear their own attorneys' fees.  *Wedgetail Ltd. v. Huddleston Deluxe, Inc.*, 576 F.3d 1302, 1304 (Fed. Cir. 2009).  Accordingly, the Court has

21

"consistently found [that] only a limited universe of circumstances warrant a finding of exceptionality." *Id.* This Court has thus repeatedly reversed unwarranted "exceptionality" findings and their accompanying fee awards. *See, e.g., Highmark, Inc. v. Allcare Health Mgm't Sys.*, 687 F.3d 1300, 1310 (Fed. Cir. 2012); *Old Reliable*, 635 F.3d at 550; *iLOR, LLC v. Google, Inc.*, 631 F.3d 1372, 1380 (Fed. Cir. 2011); *Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*, 603 F.3d 943, 966 (Fed. Cir. 2010); *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1337-39 (Fed. Cir. 2009); *FieldTurf Int'l, Inc. v. Sprinturf, Inc.*, 433 F.3d 1366, 1373 (Fed. Cir. 2006); *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1385 (Fed. Cir. 2005); *Stephens v. Tech Int'l, Inc.*, 393 F.3d 1269, 1276 (Fed. Cir. 2004); *Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324, 1331 (Fed. Cir. 2003).

Indeed, given the *exceptional* and *limited* circumstances under which a district court may award fees under the Patent Act, this Court applies an "exacting standard" in reviewing such awards. *iLOR*, 631 F.3d at 1377. Where, as here, a district court bases its finding of "exceptionality" on a holding that the case was "objectively baseless," the Court reviews that predicate holding *de novo*, *i.e.*, "without deference" to the district court. *Highmark*, 687 F.3d at 1309. And where, as here, a district court also bases its finding of exceptionality on a predicate finding that a party acted in "subjective bad faith," the Court searches the record to

determine whether the district court committed "clear error" in finding, as it must, "clear and convincing evidence" of such bad faith. *Id.* at 1310. Indeed, "[i]n view 'of the substantial economic and reputational impact' of an award of attorney fees, this court is *required* to *examine the record with care* to determine whether the trial court has committed clear error" in this regard. *Old Reliable*, 635 F.3d at 543 (emphases added) (quotation marks and citation omitted).

Ultimately, although a district court has discretion to find a case "exceptional" either on the ground that it was "objectively baseless" and pursued in "subjective bad faith," or on the ground that a party engaged in "litigation misconduct," such discretion "is not unbridled." *Old Reliable*, 635 F.3d at 543. Here, a careful examination of the record reveals that the district court erred in finding this case exceptional, and thus abused its discretion in sanctioning Plaintiffs as it did.

**B.    This Case Is Not Exceptional Under the Patent Act**

A district court may find a case "exceptional" under the Patent Act, and thus impose a fee-shifting sanction, if it finds "clear and convincing evidence" that "both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless." *Brooks Furniture*, 393 F.3d at 1381-82. Under this standard, "the plaintiff's case must have no objective foundation, and the plaintiff must actually know this." *iLOR*, 631 F.3d at 1377. Here, the district court erred in

23

both respects.

### 1.    The Court Erred in Finding Plaintiffs' Claims Objectively Baseless

The record does not support a finding of objective baselessness.  To be objectively baseless, the "allegations must be such that *no reasonable litigant* could reasonably expect success on the merits."  *Highmark*, 687 F.3d at 1310 (emphasis added).  As noted above, "the threshold objective prong" of an exceptionality finding "is a question of law based on underlying mixed questions of law and fact and is subject to *de novo* review."  *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1004 (Fed. Cir. 2012).  This Court reviews the "determination of objective reasonableness without deference" to the district court.  *Highmark*, 687 F.3d at 1309.  Thus, for the Court to affirm the district court's finding that this case was objectively baseless, it must find by *clear and convincing evidence* that that *no reasonable litigant* could reasonably have expected success on the merits.  This it cannot do.

### a.    Plaintiffs Supported Their Claims with Expert Opinion

First, Plaintiffs corroborated their trade secret and inventorship claims with the opinions of four highly-respected experts.  Those experts were: (1) Dr. Nenad Medvidovic, tenured professor in the Computer Science Department at the University of Southern California who has published extensively on the

architecture of message-based software systems; (2) Dr. Anant Sahai, tenured associate professor in the Electrical Engineering and Computer Sciences Department at the University of California at Berkeley with a Ph.D. from MIT; (3) Dr. David Garlan, tenured professor of Computer Science at Carnegie Mellon University with a Ph.D. from Carnegie Mellon, who has published over 150 scholarly articles on software architecture; and (4) Dr. Paul Min, tenured associate professor at Washington University in the Electrical and Systems Engineering Department with a Ph.D. in Electrical Engineering from the University of Michigan.  *See* A2899-2942 (Garlan Dec., filed under seal); A2943-3010 (Medvidovic Dec., filed under seal); A3011-48 (Min Dec., filed under seal); A3049-87 (Sahai Dec., filed under seal).

Together, these experts confirmed that Locate had made inventive contributions to the GPS field, and that those contributions were found in Defendants' patents.  This evidence supports the conclusion that a reasonable litigant would reasonably have expected success on the merits.  *See Idaho Watersheds Project v. Jones*, 253 Fed. Appx. 684, 687 (9th Cir. 2007) ("[W]hen a plaintiff's claim is supported by expert testimony, it is generally not frivolous."); *Medtronic*, 603 F.3d at 959.  Although Plaintiffs presented evidence of these corroborating expert opinions below (A9890:25 – A9892:4; A9893:24 – A9894:6), the district court disregarded it.  Thus, nowhere in its findings of objective

baselessness did the court explain how or why these expert opinions were unavailing.  Instead, it simply ignored them.

### b.    Plaintiffs Submitted Substantial Evidence of Inventorship

Second, although the district court found that Plaintiffs "could not have reasonably expected success on the merits of the patent claims without knowing the identify [sic] of the allegedly omitted inventors" (A9675:3-5), Plaintiffs *did* submit substantial evidence in opposition to Defendants' motion for summary judgment (A6639-7735), and made a good-faith effort to identify omitted inventors for each patent at issue (A8640:6 – A8642:7).  Indeed, Plaintiffs consistently maintained throughout the litigation that Locate employees and engineers developed the information that was incorporated in Defendants' patents.  And while Plaintiffs initially identified omitted inventors for thirteen of the sixteen patents at issue, Plaintiffs voluntarily reduced the number of patents in contention to six, and identified omitted inventors for all six patents before any patent-related depositions occurred.  A9412-14 ¶¶ 33, 34, 40.[4]

---

[4]    The district court suggested that Plaintiffs asserted claims on ninety-two distinct patents.  A9678:15-18; A9684:8-10.  This is incorrect.  Only sixteen U.S. patents were ever at issue.  The remainder were foreign counterparts of those patents.  A9413-14 ¶¶ 39-40.  In any event, Plaintiffs withdrew their claims as to ten of the sixteen patents, and this Court has been clear that a patentee should be *encouraged*, not penalized, for narrowing the issues and claims during the course of litigation.  *Union Pacific Resources Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 694 (Fed. Cir. 2001).

Plaintiffs acknowledge that it took them some time to precisely identify all omitted inventors. The facts concerning inventorship were highly complex, and interrelated with claim construction. Further, discovery in the case commenced in the same time frame that new counsel for Plaintiffs were entering the case. Plaintiffs' current trial counsel, Hughes Hubbard & Reed LLP ("Hughes Hubbard") noticed its appearance in March 2010—some 17 months after the complaint was filed. A8640:19-20. Defendants served their first set of interrogatories on April 5, 2010—a week and a half after Hughes Hubbard was formally engaged. A9412-13 ¶ 33.

Even though Hughes Hubbard was still gathering facts and interviewing witnesses, Plaintiffs timely responded to the first set of interrogatories only 35 days after they were served. *Id.* In response to Interrogatory No. 1, asking for the identification of the omitted inventors for the sixteen patents at issue, Plaintiffs provided names for thirteen patents and truthfully stated "Under investigation" for the remaining three. *Id.* Only six weeks later, as a result of Hughes Hubbard's continuing investigation, Plaintiffs served supplemental responses, identifying omitted investors for the remaining three patents and refining Plaintiffs' prior answers as to certain of the thirteen other patents. A9413 ¶ 34. Plaintiffs then

served their second supplemental responses on May 14, 2012.[5]  Two weeks later, on May 29, 2012, Plaintiffs served their third (and final) supplemental responses, before depositions on the inventorship claims began.  *Id.* ¶ 37.

The time periods involved, and the nature of Plaintiffs' employees and their various roles, caused the identification of omitted inventors and correlation of their efforts to specific patent claims to be a difficult and time consuming task.  Locate developed its inventions in 1999 through 2001, ten years before discovery commenced in this action.  Those inventions were the result of a group effort, involving Clise, Crowson, and a number of Locate engineers.  By mid-2000, Locate had over fifty employees, including thirty-five engineers.  A2086 (filed under seal) ¶14.  None of the potential omitted inventors was still employed by Plaintiffs when discovery commenced.  Many had relocated, requiring extensive travel by Plaintiffs' counsel.  A9413 ¶ 38.

In any event, Clise and Crowson conceived of most aspects of the inventions, but relied on Locate's engineers to create the architecture for the software and write the source code.  A9408 ¶ 14.  Clise and Crowson were familiar with Locate's own implementation of what they and their employees had invented.  When SnapTrack and Qualcomm drafted their patents, however, their descriptions

---

[5]  The delay between the first and second supplemental responses was due to the stay of discovery related to the patent claims issued by the court in February 2011.  A9413 ¶ 35.  Discovery on the patent claims did not resume until April 2012, after the district court granted partial summary judgment.  *Id.*

were set in a framework based on telecommunications standards, which Qualcomm was also deeply involved in proposing. Clise and Crowson were not conversant with this standards-based terminology at deposition (*see, e.g.*, A9085:2-8)—but this fact simply has no relevance to Plaintiffs' inventorship of the claimed subject matter. *See Davis v. Uke*, 27 U.S.P.Q.2d 1180, 1182 n.5 (B.P.A.I. 1993) ("[C]ommon inventorship [of subject matter] . . . 'described' in an application is irrelevant. The relevant question is who invented the subject matter of the . . . claims[.]")

Defendants nevertheless seized on Clise and Crowson's difficulty with standards terminology to argue that they could not have been inventors. But this was an improper inference, since inventorship concerns what is claimed, not how the detailed description is expressed. The district court found that Plaintiffs "were never able to find individuals that would take credit for inventing any of the relevant patents or profess knowledge of specifics relating to the patents." A9675:16-19. But in doing so, the court erroneously conflated the difficulty of presenting evidence on a nuanced and historically-complex question of fact with a *failure* to produce evidence. Plaintiffs did not fail to submit evidence. Rather, the court adopted Defendants' misleading view of testimony from witnesses such as Clise and Crowson, and adopted and applied claim constructions (which Plaintiffs separately submit were completely in error) in a manner that would permit it to

29

completely overlook the evidence that was squarely before it.  *See* Brief of

Plaintiffs-Appellants in No. 2013-1058, at 63.

Thus, given the history of this case, it is not surprising that proof of omitted

inventors presents complex questions of fact as well as legal issues of claim

construction.  Indeed, even if the district court found Plaintiffs' evidence

(including the testimony of Clise and Crowson) less than compelling in some

respect, and even if this Court were to uphold the district court's informal

interpretation of the claims, the existence of competing interpretations of the

evidence and patent claims does not constitute clear and convincing evidence that

"no reasonable litigant could reasonably expect success on the merits."  *Highmark*,

687 F.3d at 1310.

### c.    Sophisticated Entities Supported Plaintiffs' Claims After Performing Substantial Due Diligence

Finally, sophisticated outside entities corroborated the merits of Plaintiffs'

claims.  Plaintiffs' trial counsel, Hughes Hubbard, performed nearly 300 hours of

due diligence before agreeing to pursue Plaintiffs' claims—and then did so on a

*contingency-fee basis*.  A9407 ¶¶ 7-10.  That a sophisticated firm would pursue

Plaintiffs' claims, and would effectively "invest" in the case by working for a

contingent fee, is strong evidence that the claims had merit—and that Plaintiffs had

good reason to believe as much.

Moreover, even *after* the bond ruling, Northwater Intellectual Property Fund

L.P. 3A ("Northwater"), a private equity intellectual property fund, lent to Gabriel approximately $3.1 million in exchange for senior secured notes issued by Gabriel, and the proceeds of the loans were used to fund the lawsuit.  A9577 ¶ 11. Plaintiffs' claims against Qualcomm were Northwater's primary collateral and source for repayment of its loans, and therefore recouping those advances depended largely Plaintiffs prevailing on those claims.  Thus, before providing funding, Northwater and its counsel, a law firm with a nationally renowned intellectual-property department, conducted substantial due diligence.  *Id.* Common sense compels the conclusion that Northwater would not have made so substantial an investment in this case unless it concluded that there was a reasonable prospect for success.

The willingness of sophisticated outside entities to fund this litigation after performing substantial due diligence supports the conclusion that a reasonable litigant could reasonably have expected success on the merits.  And again, although Plaintiffs presented the evidence of this investment and due diligence below (A9510:16 – A9511:4; A9884:25 – A9885:7; A9945, 47), the district court took no notice of it.  Simply put, the court's finding of objective baselessness is not only unsupported by the record—it is contrary to a substantial body of evidence.

### 2.     The Court Erred in Finding Subjective Bad Faith

The record simply does not support a finding that Plaintiffs acted in bad

31

faith.  As a threshold matter, that Plaintiffs did not succeed on the merits, or even that Plaintiffs' claims were subject to dispute, is not evidence of bad faith.  An action "does not become unreasonable in terms of [the Patent Act] if the infringement can reasonably be disputed."  *Brooks Furniture*, 393 F.3d at 1384.  Indeed, as this Court has repeatedly observed, a "patentee's ultimately incorrect view of how a court will find does not of itself establish bad faith."  *Id.*; *see also Dominant Semiconductors Sdn. Bnd. v. Osram GmbH*, 524 F.3d 1254, 1260 (Fed. Cir. 2008) (explaining that courts "must resist the understandable temptation to engage in *post hoc* reasoning by concluding that an ultimately unsuccessful action must have been unreasonable or without foundation").  Instead, subjective bad faith means that "the plaintiff's case must have no objective foundation, and *the plaintiff must actually know this*."  *iLor*, 631 F.3d at 1377 (emphasis added).

The district court became convinced that Plaintiffs *knew* their claims had no basis by virtue of Judge Anello's 2010 bond ruling.  Indeed, what the court found to be clear and convincing evidence of Plaintiffs' subjective bad faith boils down to a finding that the bond ruling predicted that Plaintiffs would lose this case and Defendants would recover attorneys' fees.  The court simply substituted Judge Anello's preliminary conclusions in place of the required evidence necessary to establish, by clear and convincing evidence, subjective bad faith.  In two ways, this was an abuse of discretion.

### a.    The Court Disregarded Facts Consistent with Plaintiffs' Good Faith Belief in Their Claims

First, the district court erred in disregarding several facts that corroborated Plaintiffs' subjective good faith. That well-qualified experts and sophisticated outside entities supported Plaintiffs' claims, after performing their own analyses and due diligence, reinforced Plaintiffs' already-existing belief in the merits of those claims. *See supra*. The district court took no note of this. Moreover, the court disregarded Plaintiffs' own conduct demonstrating their subjective good faith. Specifically, following the bond ruling, Plaintiffs *posted the $800,000 bond*. As Defendants repeatedly insisted at the bond hearing, Plaintiffs would post a substantial bond only if they believed their case had merit: "if it's a real case, they can post a sizable bond." A2391:13-16; *see also* A2352:9-14 ("[A]gain, *if it is a real case*, they'll post it[.]"); A2353:11-12 ("And again, *if it's a real case*, they'll be able to post it."); A2370:20-21 ("We ask that bond be issued, knowing, again I'm being forthright, knowing they can't post it so that we end this case. Again, *if it's a real case*, they'll find a source to post it."). This was a "real case," and Plaintiffs believed as much. Plaintiffs' actions are inconsistent with those of a litigant that believes its claims have no legitimate chance of success. Plaintiffs presented this evidence both in opposition to Defendants' motion for fees and at the hearing on that motion (A9509:6-7; A9884:13-24), but the district court's order ignored it.

33

### b. The Court Erroneously Adopted a Distorted and Incorrect View of the Evidence

Second, the district court also erred in adopting the bond ruling's misinterpretation of a series of e-mails written by a former director and a former employee. At both the bond hearing and the attorneys' fees hearing, Defendants took sound bites from various e-mails and badly distorted their meaning. A9861:1 – A9862:20. For example, Defendants repeatedly misconstrued a January 2010 e-mail from Gabriel board member John Hall, stating "we have no case[,] [j]ust a lot of talk" (A7873:19-20; A9593, ¶ 2; A9596-98); and a December 2009 e-mail from former employee Allan Angus, stating "the real value was never there anyway" (A6006; A7873:23-24). The district court adopted Defendants' interpretation of these e-mails, finding that Plaintiffs lacked a belief in their case. Read fairly and in context, however, these e-mails say something different.

The e-mails at issue were written at a time when Plaintiffs were seeking new counsel and further funding for the litigation. *See* A9888:7 – A9889:25. Plaintiffs' lead counsel, Munck Carter, had just withdrawn, and Plaintiffs were running out of cash to fund the litigation. *Id.* Munck Carter had refused to turn over its client files to Plaintiffs. *Id.* Thus, the drafters of the e-mails were actually complaining that, despite several years of representation by Munck Carter, Plaintiffs had no collection of key documents or written narrative of the litigation to show to replacement counsel or potential investors. The drafters of the e-mails

were not opining that the case was frivolous.  As John Hall, a Gabriel director,

explained in one e-mail:

> Munck Carter never produced the materials the board requested so
> Gabriel could obtain third party financing for the lawsuit . . . .
> These companies talked to Munck Carter requesting material but to
> no avail.  Unacceptable!! And outragoius [sic].

A9596-98; *see also* A9576 ¶ 7. [6]

Indeed, in opposing Defendants' motion for fees, Plaintiffs submitted a

clarifying declaration from Mr. Hall.  A9593-95.  He explained that his January

2010 e-mail did not reflect a belief that this lawsuit lacked merit, but rather

reflected frustration with Munck Carter.  *Id.* ¶ 3.  Hall confirmed that Plaintiffs had

requested that Munck Carter provide them with relevant documents so that they

could present information about the case to prospective law firms and investors.

*Id.*  As Hall's e-mail stated, however, "Munck Carter never produced the materials

the board requested[.]"  *Id.*  Munck Carter's failure to provide Plaintiffs with these

materials caused Mr. Hall great concern.  *Id.* ¶ 4.  As Hall noted, Plaintiffs were

---

[6]   According to the district court, because Plaintiffs finally recovered their
documents from Munck Carter after several months of demands, Plaintiffs
should have been able to produce evidence at the bond hearing.  A9676:8-17.
But this conclusion overlooks that little discovery had taken place at the time of
the bond hearing, which the bond ruling recognized.  A2417:21-22.  For
purposes of the fee order, the district court unfairly equated the bond hearing
with a trial and then faulted Plaintiffs for their inability to unequivocally prove
their claims at an early stage in the litigation.  In any event, whether the
documents being withheld ultimately proved to be valuable is not the point.
What matters is that Plaintiffs *believed* at the time that they were important, and
thus sent the e-mails at issue in frustration of not having them.

"looking for financing, a new law firm, but with what[?]  The cupboard [was] bare."  *Id.*  Plaintiffs were without the "most important documents and the narrative that supports the case."  *Id.*  They were "undertaking this huge task with no money, limited resources, and no time due to Munck's [conduct]."  *Id.*

With no ability to show law firms and investors the material they requested, Hall worried that nobody would be willing to "invest a dime."  A9594 ¶ 4.  Thus, in writing "we have no case[,] [j]ust a lot of talk," he expressed his frustration over the inability to show law firms and investors evidence that they *did* have a case. *Id.*  Indeed, Hall believed at that time, and continues to believe, that Plaintiffs had evidentiary support for their claims, and that those claims were valid.  *Id.*  The district court ignored Mr. Hall's declaration.

Similarly, Mr. Angus testified that his December 2009 e-mail was not meant to suggest that he believed that Plaintiffs' case lacked merit.  Rather, it reflected his belief that without his expertise—Plaintiffs had ended his employment—the value of Plaintiffs' case suffered.  This was what he meant in discussing the "real value" in the case.  A9526 ¶ 3; A9551:22 – A9555:6.  For example, Angus explained that "the folks at Gabriel," lacking his expertise, "were a group of businesspeople who . . . wouldn't have been able to come to an assessment about what [a given patent document] was . . . relevant to in the case."  A9554:4-9. Further, in stating "the real value [was] always going to be in the fight," he meant

36

that obtaining value for Plaintiffs would require his services in negotiating with Defendants.  A9526 ¶ 2; A9531:9 – A9533:20.  In other words, Angus's testimony explains that his December 2009 e-mail was not meant to disparage the value of Plaintiffs' case, but rather to indicate that he believed his technical knowledge and negotiating skills were key to realizing that value.  Plaintiffs presented this evidence in their opposition briefing (A9497:1-12) and at the fees hearing (A9904:11 – A9905:8), but it went ignored in the district court's order.

In sum, the district court disregarded substantial evidence demonstrating that Plaintiffs believed in the merits of their case; and the court accepted a one-sided interpretation of the evidence, deferring largely to an earlier preliminary ruling by a different judge.  Rather than carefully weighing all of the evidence in the record, the district court adopted the die as already cast.  The court abused its discretion in doing so, and in erroneously finding *clear and convincing evidence* that Plaintiffs pursued their patent claims in bad faith.

### 3.   The Court Erred in Finding that Plaintiffs Engaged in Litigation Misconduct

A district court also may award fees under the Patent Act if it finds that a party engaged in "litigation misconduct."  *Old Reliable*, 635 F.3d at 549.  In other words, "[a]n award of attorneys' fees is permissible when there has been some material inappropriate conduct related to the matter in litigation, such as . . . misconduct during litigation, vexatious or unjustified litigation, conduct that

37

violates Fed. R. Civ. P. 11, or like infractions." *iLOR*, 631 F.3d at 1376-77.

Thus, fee sanctions are not granted lightly: "Litigation misconduct generally involves unethical or unprofessional conduct by a party or his attorneys during the course of adjudicative proceedings," and includes advancing frivolous arguments during the course of the litigation or otherwise prolonging litigation in bad faith. *Old Reliable,* 635 F.3d at 549; *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1380 (Fed. Cir. 2009) (holding that an award of attorney fees required "multiple misrepresentations" to the court); *see also Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1324 (Fed. Cir. 2011) (including "frivolous filings and engaging in vexatious or unjustified litigation" among the conduct supporting sanctions); *Mathis v. Spears*, 857 F.2d 749, 752 (Fed. Cir. 1988) (awarding attorneys' fees for "blatantly misleading the PTO" and then "attempt[ing] to employ the courts as handmaidens to its inequity"). No such sanctionable conduct occurred here.

In over four years of litigation, Defendants never even *sought* sanctions by way of a Rule 11 motion, or for unduly prolonging the litigation under 28 U.S.C. § 1927. Nor did they feel the need to file a single motion to compel further discovery. Thus, instead of awarding fees on these bases, the district court found litigation misconduct because Plaintiffs purportedly pursued inventorship claims without knowing the identity of the omitted inventors. A9678:17-19. Again, in the district court's view, Plaintiffs' continuation of the litigation following the

bond ruling constituted litigation misconduct.

As explained above, however, this narrow view of the case disregards that, *after the bond ruling*, (1) Plaintiffs submitted declarations of four expert witnesses in support of their claims (A2899-2942; A2943-3010; A3011-48; A3049-87 (all filed under seal); *see also* A9890:25 – A9892:4; A9893:24 – A9894:6); (2) Plaintiffs provided substantial evidence of inventorship (A6639-7735); (3) Plaintiffs posted an $800,000 bond because they believed their case had merit (A9509:6-7; A9884:13-24); and (4) Northwater provided $3.1 million in funding (A9510:16 – A9511:7; A9884:25 – A9885:7).  Thus, Plaintiffs acted consistently with their good-faith belief in the merits of their claims.

In that light, the district court's finding of litigation misconduct amounts to a backstopping of its attorneys' fee award, rather than a genuine effort to identify and correct misconduct.[7]  *See Reactive Metals and Alloys Corp. v. ESM, Inc.*, 769 F.2d 1578, 1582 (Fed. Cir. 1985) (holding that it is "incumbent on the trial court

---

[7]    The district court also suggested, without actually finding, that Plaintiffs' litigation tactics were "less-than-honest" (A9677:20-21), and that other purported conduct *could* have constituted litigation misconduct (A9677 n.3). However, the court expressly declined to "address these . . . allegations of litigation misconduct" (A9688:2-3), and further explained that it did not "find that [they] . . . constitute[d] litigation misconduct" (A9677 n.3).  Thus, the district court provided no analysis to support any such finding.  *See Stephens*, 393 F.3d at 1276.  Accordingly, the court's reference to purported litigation misconduct without any analysis cannot support an award of attorneys' fees under the Patent Act.  Indeed, the absence of necessary factual findings to support the district court's dramatic conclusions further illustrates the need for reversal.

not only to make the ultimate finding that the case is exceptional, but also to articulate the more particular factual findings from which the finding of 'exceptional circumstances' follows"). The court's failure to acknowledge relevant evidence in this regard constitutes an abuse of discretion.

## II.    The District Court Abused Its Discretion in Awarding Fees Under California's Uniform Trade Secrets Act

### A.    Standard of Review

This Court applies the trade secret law of the relevant state, in this case, California. *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009). An award of attorneys' fees under CUTSA is reviewed for abuse of discretion. *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1111 (9th Cir. 2007); *SASCO v. Rosendin Elec., Inc.*, 207 Cal. App. 4th 837, 844-45 (2012). For reasons similar to those outlined above, the district court abused its discretion in awarding fees under CUTSA.

### B.    Plaintiffs Asserted and Maintained Their Trade Secret Claims in Good Faith

A court *may* award reasonable attorneys' fees to a prevailing party where a trade secret claim is made in bad faith. Cal. Civ. Code § 3426.4. Bad faith requires a showing of both (1) objective speciousness, and (2) subjective bad faith in bringing or maintaining the action. *FLIR*, 174 Cal. App. 4th at 1275; *Gemini,* 95 Cal. App. 4th 1261. The standard for fees under CUTSA is similar to the Patent

Acts' two-part test. *SASCO*, 207 Cal. App. 4th at 844-45.

The district court found bad faith because Plaintiffs purportedly were never able to "articulate the alleged secrets" for discovery purposes (A9682:14), and the bond ruling put Plaintiffs on notice that the trade secret claims were time-barred (A9681:28 – A9682:1). As demonstrated below, however, Plaintiffs *did* sufficiently articulate their trade secrets—at least with enough supporting evidence to avoid *sanctions*. Further, given that the 2010 bond ruling's findings regarding the timeliness of Plaintiffs' claims differed substantially from the district court's 2012 findings in this regard, Plaintiffs were not on sufficient notice of deficiencies in their claims to warrant sanctions. Plaintiffs' claims were thus neither objectively specious nor brought or maintained in subjective bad faith. The district court thus abused its discretion in awarding fees under CUTSA.

## 1. The Court Erred in Finding Objective Speciousness

An "objectively specious" trade secret claim is one without any substance in reality, *i.e.*, one about which an objective review of the facts and evidence indicates that the accusation was *completely unfounded* under the elements of CUTSA. *See FLIR*, 174 Cal. App. 4th at 1276 (providing that "[o]bjective speciousness exists where the action superficially appears to have merit but there is a complete lack of evidence to support the claim"); *Gemini*, 95 Cal. App. 4th at 1261 (explaining that to warrant an award of fees under CUTSA, "the claim must

have been without substance in reality, if not frivolous").

The district court found the trade secret claims objectively specious because, according to Magistrate Judge Dembin, Plaintiffs failed on several occasions "to articulate the trade secrets with particularity" for *discovery* purposes under section 2019.210 of the California Code of Civil Procedure.  A9680:25 – A9681:2.  In doing so, however, the district court conflated California's discovery barrier with a decision on the *merits*.  Without providing any analysis, the court simply adopted Judge Dembin's ruling.  Indeed, the court provided no authority for the proposition that a failure to articulate a trade secret designation under a state procedural statute constitutes objective speciousness.

More importantly, the district court erred because Plaintiffs' trade secret identifications *were sufficient* to enable discovery to go forward.[8]  California law is clear that the submission of credible expert opinions is sufficient to allow trade secret discovery:

> Where credible experts declare that they are capable of understanding the designation and of distinguishing the alleged trade secrets from information already known to person in the field, the designation should, as a general rule, be considered adequate to permit discovery to commence.  Our discovery statutes are designed to ascertain the truth, not suppress it.  Any doubt about discovery is to be resolved in favor of disclosure.

---

[8]  Plaintiffs also contest the applicability of California's state procedural rule to bar discovery in federal court.  *See* Brief of Plaintiffs-Appellants in No. 2013-1058, at 53-55.

*Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826, 836 (2005). Plaintiffs submitted declarations from four well-qualified experts, who stated that they understood the trade-secret identifications and that those identifications were sufficiently particular to allow a comparison with what was generally known to those skilled in the field. A2899-2942 (Garlan Dec., filed under seal); A2943-3010 (Medvidovic Dec., filed under seal); A3011-48 (Min Dec., filed under seal); A3049-87 (Sahai Dec., filed under seal); *see also* A9890:25 – A9892:4; A9893:24 – A9894:6. Given those submissions, Plaintiffs' identification was adequate to permit discovery to proceed.

Indeed, under *Advanced Modular Sputtering*, Plaintiffs described their trade secrets with "reasonable particularity" and should have been allowed to conduct discovery. A trade secret identification is similar to a "pleading," which should be "liberally construed." *Advanced Modular Sputtering*, 132 Cal. App. 4th at 907. Thus, a plaintiff satisfies its burden of describing a trade secret with "reasonable particularity" once it makes a reasonable showing that is fair, proper, just, and rational under all circumstances. *Id.* at 908. Here, Plaintiffs did so.

At a minimum, Plaintiffs presented sufficient evidence of their trade secrets to render an attorney-fee sanction unwarranted. Plaintiffs made several successive motions seeking trade secret discovery—supported by expert opinion. A2447-48; A3726-37; A3762-75; A3826-27. Although Judge Dembin ultimately found

43

Plaintiffs' trade secret identifications inadequate for discovery purposes, he also noted that the issue was a close call. *See* A4944:12-23 ("I've read your trade secret designation number one and I think I understand what it is. . . . *this one makes sense to me*.") (emphasis added); A4943:14 ("I think you're in good shape[.]"); A4945:23 ("Trade Secret 1 makes sense to me."); A4972:19-22 ("[Y]ou have at least made me think that you've crossed the barrier . . . with Trade Secret 1."). This was thus not an issue about which "there [was] a complete lack of evidence." *FLIR*, 174 Cal. App. 4th at 1276. It was not objectively specious.

### 2.    The Court Erred in Finding Subjective Bad Faith

Showing subjective bad faith requires showing an improper purpose or motive—which can be inferred "by evidence that [the party] intended to cause unnecessary delay, filed the action to harass respondents, or harbored an improper motive"; or "where the plaintiff proceeds to trial after the action's fatal shortcomings are revealed by opposing counsel." *FLIR*, 174 Cal. App. 4th at 1276. Here, the district court failed to acknowledge evidence showing that Plaintiffs pursued their claims in good faith; and it erroneously relied on Judge Anello's prior ruling to support what appears to have been a foregone conclusion.

### a.    The Court Disregarded Evidence of Good Faith

In at least three ways, the district court disregarded evidence of Plaintiffs' good faith. First, Plaintiffs provided opinions from four well-qualified experts in

support of their claims.  *See* A2899-3087 (filed under seal); *see also* A9890:25 –

A9892:4; A9893:24 – A9894:6.  These expert declarations supported Plaintiffs'

good faith belief that their trade secrets had been misappropriated.  Second,

Plaintiffs posted an $800,000 bond.  A2435-45.  As Defendants conceded: "*if it's a*

*real case*, they can post a sizable bond, your honor."  A2391:15-16.  Plaintiffs

believed in the merits of the case—and posted the bond.  And third, Plaintiffs'

good faith belief in their claims is evidenced by—and was reinforced by—the

willingness of sophisticated outside entities to invest their time, effort, and money

in the case after performing their own substantial due diligence.  *See* A9407, ¶¶ 7-

10; A9577, ¶ 11; A9587-92.  Again, the willingness of sophisticated entities to

pursue this litigation supports the conclusion that it was prosecuted in good faith,

and that Plaintiffs believed it to have merit.

> **b.      The Court Erroneously Relied on an Incorrect Prior Ruling**

Further, the district court erroneously relied on Judge Anello's bond ruling

to support a finding of subjective bad faith.  Specifically, the court inferred bad

faith based on the bond ruling's prediction that the trade secret claims were time-

barred.  A9681:10-13.  Indeed, in awarding fees, the district court relied heavily on

the bond ruling, stating "Plaintiffs received more than sufficient notice regarding

the flaws in their claims [.]"  A9682:11-12.  In two ways, this reliance was an

abuse of discretion.

First, the bond ruling was wrong about the statute of limitations.

Throughout the litigation, Defendants changed their argument regarding the

timeliness of Plaintiffs' trade secret claims.  In briefing their bond request,

Defendants argued the "statute began running as early as January 1, 1999[.]"

A827:21 – A828:1; *see also* A2186:23-24 ("Locate had reason to suspect that the

supposed 'claim' existed as early as 1999").  Judge Anello accepted this argument

in ruling on the bond request.  A2414:3-27.  But in later granting partial summary

judgment, the district court found that the limitations period was triggered in 2003

or 2004.  A35:12 – A42:7.  In other words, the 2010 bond ruling and the 2012

partial summary judgment ruling found Plaintiffs' trade secret claims time-barred

based on different sets of facts and time periods.  Obviously, the issue was not

clear cut.[9]

In other words, it is simply not the case that Plaintiffs decided to go forward

despite Defendants having demonstrated "the specific shortcomings of the case."

*Gemini*, 95 Cal. App. 4th at 1264.  Indeed, whether events in 2003 or 2004

rendered Plaintiffs' claims time-barred was *not fully litigated* until the parties

engaged in substantive discovery and Defendants brought a motion for partial

summary judgment.  That Plaintiffs lost that fight is not, and cannot reasonably be,

---

[9]  As discovery revealed, the trade secret claims were not time barred as predicted
by the bond ruling.  This comes as no surprise as the bond ruling noted that
"this case is in the early stages of discovery, and few, if any, depositions have
occurred."  A2417:21-22.

grounds for an award of attorneys' fees.  *See Aspex Eyewear Inc. v. Clariti Eyewear, Inc.,* 605 F.3d 1305, 1315 (Fed. Cir. 2010) (explaining that "[d]efeat of a litigation position, even on summary judgment, does not warrant an automatic finding that the suit was objectively baseless").

Second, the district court's own 2012 findings regarding the timeliness of Plaintiffs' claims were not only *new information* to Plaintiffs—they also were based on *reasonably contested* versions of the facts.  Although the court relied on statements by William Clise and Maurice Shanley to find Plaintiffs' claims time-barred due to events occurring in 2003 or 2004, Clise subsequently testified that he was *mistaken* in his 2003 belief that SnapTrack was using Locate's technology (A9526 ¶ 4; A9559:2 – A9560:7); Defendants *conceded* that Clise was "wrong" in that initial suspicion (A4363:9 – A4364:4); Shanley testified that it was not until February, March, or perhaps even June of 2005 that he "had factual reason to believe that perhaps misappropriation had occurred" (A9568:21 – A9569:4); and Allan Angus, to whom Shanley deferred with regard to misappropriation issues, testified that he did not conclude that certain "Locate technology appeared in Snaptrack patents," *i.e.*, that misappropriation may have occurred, until "the spring [or] summer of 2005" (A9526 ¶ 3; A9539:2-14; A9540:3-17; A9541:11-18).  Thus, again, Plaintiffs reasonably relied on this evidence to pursue their claims despite Defendants' shifting arguments regarding the statute of limitations.  In other

words, they pursued those claims in good faith.

Ultimately, the district court traveled far beyond the contours of previous attorneys' fee awards under CUTSA. California courts awarding attorneys' fees under CUTSA have done so where misappropriation claims were made for an anti-competitive reason, the trade secrets lacked monetary value, or the plaintiff was *clearly on notice* of defects in its claims. *See CRST Van Expedited*, 479 F.3d at 1111-12 (holding that claim was "objectively specious" because there was no proof that the alleged trade secrets were worth anything); *FLIR*, 174 Cal. App. 4th at 1274-876 (finding objective speciousness because the action was filed as a preemptive strike and for an anticompetitive purpose, and because there was no evidence of misappropriation, threatened misappropriation, imminent harm, or ongoing wrongdoing); *Gemini*, 95 Cal. App. 4th at 1255, 1264 (holding that a claim was objectively specious and in bad faith where the jury found that the plaintiff acted in bad faith, the trade secrets at issue had no economic value, and defense counsel had pointed out the trade secret shortcomings with no response from the plaintiff).

No such factors are present here. This case did not involve anti-competitive conduct or motives, and there has been no suggestion that the trade secrets lacked economic value. Moreover, given Defendants' shifting limitations-period arguments and the equivocal evidence regarding the statute of limitations defenses,

Plaintiffs were not *clearly on notice* of shortcomings in their claims.  Therefore,

the district court's fee award under CUTSA must be reversed.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the reasons stated above, the Court should reverse the district court's

award of attorneys' fees under both the Patent Act and California's Uniform Trade

Secrets Act, and vacate the money judgment against Plaintiffs.

Dated:    August 9, 2013                CHAPIN FITZGERALD LLP


                                By:    /s/ Kenneth M. Fitzgerald
                                       Kenneth M. Fitzgerald
                                       Robert G. Knaier
                                       Keith M. Cochran

                                       *Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B). This brief contains 11,861 words as calculated by the "Word Count" feature of Microsoft Word 2010, the word processing program used to create it.

The undersigned further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point font.

Dated:   August 9, 2013            By:   /s/ Kenneth M. Fitzgerald
                                          Kenneth M. Fitzgerald

## CERTICATE OF SERVICE

I certify that on August 9, 2013, I caused to be electronically filed the foregoing BRIEF OF PLAINTIFFS-APPELLANTS' GABRIEL TECHNOLOGIES CORPORATION AND TRACE TECHNOLOGIES, LLC, including the addendum ORDER GRANTING MOTION FOR ATTORNEYS' FEES with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit, using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.  Within 5 days of this filing, 6 bound copies will be delivered to the Court in accordance with the Court's Administrative Order Regarding Electronic Case Filing, ECF-10(B).

By:    /s/ Kenneth M. Fitzgerald
       Kenneth M. Fitzgerald

# ADDENDUM

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| GABRIEL TECHNOLOGIES CORPORATION and TRACE TECHNOLOGIES, LLC, | ) ) ) | Civil No. 08cv1992 AJB (MDD) |
| | ) | |
| Plaintiff, | ) ) | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' |
| v. | ) ) | MOTION FOR ATTORNEYS' FEES AS TO PLAINTIFFS AND NON-PARTY |
| QUALCOMM INCORPORATED, SNAPTRACK, INC. and NORMAN KRASNER, | ) ) ) | WANG, HARTMAN, GIBBS & CAULEY, PLC |
| | ) | |
| Defendants. | ) ) | (Doc. No. 332) |
| | ) | |

Before the Court is Defendants' Motion for Attorneys' Fees as to Plaintiffs and Non-Party Wang, Hartman, Gibbs & Cauley, PLC ("WHGC"), Plaintiffs' local counsel.[1] (Doc. No. 332.) Plaintiffs and WHGC filed separate opposition briefs to Defendants' motion. (Doc. No. 355 and 354, respectively.) On January 17, 2013, the Court held a motion hearing and took the matter under

---

[1] Defendants' Motion for Attorneys' Fees originally sought fees from Plaintiffs' lead counsel, Hughes, Hubbard & Reed ("Hughes Hubbard") as well. However, Defendants and Hughes Hubbard reached a settlement on the issue of attorneys' fees prior to the hearing on this matter. Accordingly, Defendants and Hughes Hubbard filed a joint request to withdraw Defendants' Motion for Attorneys' Fees as to Hughes Hubbard. (Doc. No. 366.) Pursuant to the settling parties' agreement, the terms of the settlement are confidential, and the Court declined the parties' offer to divulge the settlement amount for the limited purpose of *in camera* review.

1  submission for further review.  (Doc. No. 367.)  For the reasons set forth below, Defendants' motion is

2  GRANTED IN PART and DENIED IN PART.

3  ***Procedural Background***

4      On October 24, 2008, Plaintiffs filed this lawsuit, which initially contained eleven causes of

5  action against Defendants, including: (1) breach of the 1999 license agreement; (2) breach of the 2006

6  license agreement; (3) fraud/fraudulent inducement; (4) tortious interference with contract; (5)

7  correction of inventorship; (6) declaration of ownership; (7) equitable patent infringement; (8)

8  misappropriation of trade secrets pursuant to California's Uniform Trade Secrets Act ("CUTSA"); (9)

9  conversion; (10) unfair competition pursuant to Cal. Bus. & Prof. Code section 17200; and (11) unjust

10 enrichment.  (Doc. No. 1.)  Plaintiffs sought over $1 billion in damages.  (*Id.*)

11     On September 3, 2009, (Doc. No. 35), the Court granted in part and denied in part the Defen-

12 dants' motion to dismiss, and ordered Plaintiffs to file an amended complaint by September 14, 2009.  In

13 the September 3, 2009 Order, Judge Anello dismissed Plaintiffs' first, fourth, seventh, ninth, tenth, and

14 eleventh causes of action with prejudice and dismissed Plaintiffs' third cause of action with leave to

15 amend.  On September 14, 2009, Plaintiffs filed a Second Amended Complaint, which contained an

16 amended fraud and fraudulent inducement claim and incorrectly re-alleged claims that were previously

17 dismissed with prejudice.  (Doc. No. 36.)  On October 8, 2009, the Court held a telephonic status

18 conference with the parties and granted Plaintiffs leave to file a Third Amended Complaint that did not

19 include the claims previously dismissed with prejudice.  (Doc. No. 39.)  On October 9, 2009, Plaintiffs

20 filed their Third Amended Complaint, which included the amended fraud and fraudulent inducement

21 claims.  (Doc. No. 40.)  Defendants again moved to dismiss Plaintiffs' fraud claim.  (Doc. No. 41.)  On

22 December 14, 2009, the Court granted Defendants' motion and dismissed Plaintiffs' fraud and fraudulent

23 inducement claim with prejudice.  (Doc. No. 48.)  On January 11, 2010, Plaintiffs filed their Fourth

24 Amended Complaint ("FAC"), which did not contain any causes of action alleging fraud.  (Doc. No. 53.)

25 On August 13, 2010, the Court denied Plaintiffs' motion for leave to file a fifth amended complaint,

26 which sought to add a fraudulent concealment claim.  (Doc. No. 104.)

27     On July 2, 2010, Defendants filed a motion for bond pursuant to California Code of Civil

28 Procedure Section 1030. (Doc. No. 81.)  Having reviewed all of the relevant evidence and the parties'

arguments, the Court granted in part and denied in part Defendants' motion for a bond on September 20, 2010. (Doc. No. 110.) The Court reduced the amount of the requested bond from $1,291,580 ($1,000,000 in fees and $291,580 in costs) to $800,000 in light of Plaintiff's financial condition at the time. (*Id.* at 23.) Pursuant to this order, Plaintiffs posted the $800,000 bond in order to avoid dismissal of their claims. (Doc. No. 121.)

On September 27, 2011, Defendants filed a partial motion for summary judgment with regard to Plaintiffs' claims for misappropriation of trade secrets and breach of contract, arguing the claims were barred by the statute of limitations. (Doc. No. 188.) On March 13, 2012, the Court granted Defendant's motion for summary judgment as to Plaintiff's eighth claim for misappropriation of trade secrets and second claim for breach of contract on ground one as to trade secrets only and grounds two, three, four, and five. (Doc. No. 252.) The Order denied partial summary judgment as to ground one and ground six of Plaintiffs' second claim for breach of contract. (*Id.*)

On August 10, 2012, Defendants filed a motion for summary judgment as to Plaintiffs' three remaining claims, which were as follows: (1) Breach of the Amended and Restated License Agreement in Ground One and Ground Six (COUNT TWO); (2) Correction of Inventorship (pursuant to 35 U.S.C. § 256) (COUNT FIVE); and (3) Declaratory Judgment of Ownership Interest in the Patents (pursuant to 28 U.S.C. § 2201) (COUNT SIX). (Doc. No. 296.) On October 1, 2012, the Court granted Defendants' motion for summary judgment and directed the Clerk to enter judgment in favor of the Defendants. (Doc. No. 328.) Plaintiffs are appealing the judgment to the Federal Circuit. (Doc. No. 340.) Defendants filed the instant motion for attorneys' fees on October 12, 2012. (Doc. No. 351.)

### I. Defendants' Motion for Attorneys' Fees as to Plaintiffs

As support for the requested attorneys' fees award, Defendants contend that Plaintiffs pursued objectively baseless patent and misappropriation claims in bad faith. Accordingly, Defendants seek attorneys' fees with regard to Plaintiffs' patent claims under 35 U.S.C. § 285 and with regard to Plaintiffs' misappropriation claims under Section 3426.4 of CUTSA. The Court addresses each statutory basis for awarding attorneys' fees in turn.

**A. Attorneys' Fees Pursuant to 35 U.S.C. § 285**

Under 35 U.S.C. § 285, a "court in exceptional cases may award reasonable attorney fees to the prevailing party" in a patent case. Defendants argue that Plaintiffs pursued frivolous patent claims and engaged in litigation misconduct such that attorneys' fees are warranted under 35 U.S.C. § 285.

Once it is determined that the party seeking fees is a prevailing party, determining whether to award attorneys' fees under 35 U.S.C. § 285 is a two-step process. *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1308 (Fed. Cir. 2012) (citing *Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324, 1327–28 (Fed. Cir. 2003)). First, a prevailing party must establish by clear and convincing evidence that the case is "exceptional." *Id.* (citing *Forest Labs, Inc.*, 339 F.3d at 1327). "A case is exceptional under Section 285 if there has been some inappropriate conduct relating to the matter in litigation." *Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1370 (citing *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005). Cases may be considered "exceptional" based upon a party's frivolous claims, inequitable conduct before the Patent and Trademark Office, or misconduct during litigation. *Id.* (citing *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989)). Second, "if the case is deemed exceptional, a court must determine whether an award of attorneys' fees is appropriate and, if so, the amount of the award." *Id.* (citing *Forest Labs.*, 339 F.3d at 1328). "[T]he amount of the attorney fees [awarded] depends on the extent to which the case is exceptional." *Special Devices, Inc. v. OEA, Inc.*, 269 F.3d 1340, 1344 (Fed. Cir. 2001). The purpose of section 285, unlike that of Rule 11, is not to control the local bar's litigation practices—which the district court is better positioned to observe—but is remedial and for the purpose of compensating the prevailing party for the costs it incurred in the prosecution or defense of a case where it would be grossly unjust, based on the baselessness of the suit or because of litigation or Patent Office misconduct, to require it to bear its own costs. *See Badalamenti v. Dunham's, Inc.*, 896 F.2d 1359, 1364 (Fed. Cir. 1990); *Cent. Soya Co., Inc. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983).

### *1. Exceptional Case*

As noted above, the Court has either dismissed or granted summary judgment in Defendants' favor as to all of Plaintiffs' claims, and thus considers Defendants to be the prevailing party in this

action. Therefore, the first step when considering whether to award attorneys' fees under Section 285 is to determine whether the case is exceptional. Here, Defendants argue that this case is exceptional based upon Plaintiffs' frivolous claims and misconduct during litigation. Defendants offer the following as the primary evidence of the frivolousness of Plaintiffs' claims: (1) Plaintiffs originally alleged patent violations of 92 patents and ultimately reduced their claims down to violations of only 16 patents; (2) the majority of Plaintiffs' claims were dismissed at the pleadings stage; (3) Plaintiffs' remaining claims did not survive summary judgment because the Court found that Plaintiffs did not have sufficient evidence to create a triable issue of fact on the issue of inventorship; (4) emails between Plaintiffs' former employees suggest that Plaintiffs knew they had no case and pursued the claims anyway; and (5) Judge Anello required Plaintiffs' to post an $800,000 in order to proceed with the case after finding "a strong likelihood Defendants will ultimately prove this case is exceptional, and attorneys' fees will be warranted at the conclusion of the litigation."

First, the Court will determine whether the case is exceptional based upon the alleged frivolousness of Plaintiffs' claims. Under Section 285, sanctions may be imposed for frivolous claims only if two separate criteria are satisfied: (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless. *Highmark, Inc. v. Allcare Health Mgmt. Sys.*, 687 F.3d 1300, 1308 (Fed. Cir. 2012) (citing *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005)). In *Highmark, Inv. v. Allcare Health Mgmt. Sys.*, the Federal Circuit detailed the analysis afforded to these two factors as follows:

> The requirement that the litigation be objectively baseless "does not depend on the state of mind of the [party] at the time the action was commenced, but rather requires an objective assessment of the merits." *Brooks Furniture Mfg.* 393 F.3d at 1382. "To be objectively baseless, the infringement allegations must be such that no reasonable litigant could reasonably expect success on the merits." *Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1260 (Fed. Cir. 2008) (internal quotation marks omitted). Furthermore, even if the claim is objectively baseless, it must be shown that lack of objective foundation for the claim "was either known or so obvious that it should have been known" by the party asserting the claim. *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007); *see also iLOR, LLC v. Google, Inc.*, 631 F.3d 1372, 1377 (Fed. Cir. 2011). This is known as the subjective prong of the inquiry. This same objective/subjective standard applies for both patentees asserting claims of infringement and alleged infringers defending against claims of infringement. *See iLOR*, 631 F.3d at 1377.

*Id.* at 1308-09.

5

08cv1992

Having reviewed the allegations of both parties and taking particular note of Judge Anello's analysis in his bond decision, the Court concludes that Plaintiffs' claims in this case were objectively baseless and brought in subjective bad faith.  Here, Plaintiffs could not have reasonably expected success on the merits of the patent claims without knowing the identify of the allegedly omitted inventors.  As this Court noted in its summary judgment order, there is a " 'presumption that the inventors named on an issued patent are correct, so misjoinder of inventors must be proven by clear and convincing evidence.' "  (Doc. No. 328 at 6 (quoting *Fina Oil and Chem. Co. v. Ewen*, 123 F.3d 1466, 1472 (Fed. Cir. 1997)).  At no point during this case has Plaintiff been able to offer the evidence necessary to overcome this presumption.  It is apparent that Plaintiffs did not know the identity of the allegedly omitted inventors when they filed this action in 2008 or at any later point in the case.

Close to two years after the case's initial filing, Judge Anello described the obvious lack of an objective foundation for Plaintiffs' claims in his bond order: "The parties began working together approximately a decade ago, Plaintiffs assert they suspected wrongdoing in approximately 2007, and they have been investigating their claims for several years.  By now, Plaintiffs should have more than mere allegations to support their theory."  (Doc. No. 110 at 22.)  Despite this warning, Plaintiffs prolonged the litigation for another two years.  In order to survive summary judgment, Plaintiffs attempted late in the litigation to finally identify the allegedly omitted inventors; however, they were never able to find individuals that would take credit for inventing any of the relevant patents or profess knowledge of specifics relating to the patents.  Thus, the Court found in its summary judgment order that Plaintiffs had failed to create a triable issue of fact regarding Plaintiffs' inventorship claims, proving Judge Anello's earlier characterization of Plaintiffs' patent claims to be correct.  Throughout this case, Plaintiffs pursued inventorship claims despite their inability to identity the allegedly omitted inventors.  Moreover, Plaintiffs continued to pursue these claims after Judge Anello pointed out the significant lack of evidentiary support.  Based on the totality of the record, Plaintiffs' claims were objectively baseless.

For similar reasons, the Court finds that Plaintiffs' brought these claims in subjective bad faith.  It was readily apparent to Judge Anello in September 2010 that Plaintiffs' had maintained this action for slightly less than two years with nothing more than "mere allegations" to support their claims.  Several emails between Gabriel employees and former employees confirm this conclusion and suggest that

1    Plaintiffs knew they lacked the requisite evidence and opted to pursue their claims nonetheless.[2]  As

2    they did at the bond hearing before Judge Anello, Plaintiffs attempt to dismiss these emails as nothing

3    more than disgruntled employees' expressions of frustration with management and the inability to

4    recover necessary documents from previous counsel, Munck Carter PC ("Munck").  (*See* Doc. No. 110

5    at 22; Pls. Opp., Doc. No. at 9-11).  However, Judge Anello disagreed with Plaintiffs interpretation and

6    determined that the emails in combination with the lack of evidence supporting Plaintiffs' claims

7    suggested that the case would ultimately be considered exceptional.  (Doc. No. 110 at 22.)  This Court

8    agrees.  While the emails certainly express frustration towards Gabriel and Munck, the repeated

9    references to the utter lack of a case suggest that, not only did Plaintiff's not have the necessary

10   evidence to bring their claims against Defendants, they were aware of the evidentiary deficiencies

11   during the early stages of litigation.  (Pls. Opp., Doc. No. 355 at 10.)  Additionally, Plaintiffs' assertion

12   that the documents retained by Munck provided the "evidentiary support for its claims" is belied by the

13   record.  (Doc. No. 355 at 10.)  At the hearing regarding the instant motion, counsel revealed that

14   Plaintiffs reacquired these documents from Munck in early 2010.  Despite Plaintiffs' recovery of these

15   purportedly crucial documents, Plaintiffs could only produce "mere allegations" to support their claims

16   at the time of the bond hearing in September 2010.  (*See* Doc. No. 110 at 22.)  This suggests that the

17   documents were not the evidentiary key to Plaintiffs' claims that Plaintiffs represents them to be.

18         On the whole, the Court concludes that the lack of evidence supporting Plaintiffs' patent claims

19   was so obvious that it should have been known by Plaintiffs.  Significantly, the emails suggest that

20   Plaintiffs knew there was no evidentiary basis for their claims in early 2010, and Plaintiffs certainly had

21   notice that their claims lacked substantiation following Judge Anello's bond order in September 2010.

22   Accordingly, the Court concludes that Plaintiffs brought objectively baseless patent claims in subjective

23   bad faith.

24         Based simply on the frivolous nature of Plaintiffs' claims, the Court is inclined to classify the

25   case as exceptional under 35 U.S.C. § 285.  The Court is further persuaded by Defendants' arguments

26   regarding Plaintiffs' litigation misconduct.  Quite apart from a finding of frivolous claims, "an

27

28         [2] Plaintiffs object to the Court's consideration of these emails; however, the emails have been
     considered by the Court previously with regard to the bond motion and the Court finds them relevant to
     its consideration of the instant motion.  Accordingly, Plaintiffs' evidentiary objections are overruled.

7

exceptional case finding can also be supported by litigation misconduct." *Highmark, Inc.*, 687 F.3d at 1315 (citing *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 919 (Fed. Cir. 2012)). Litigation misconduct involves unethical or unprofessional conduct by a party or his attorneys, but may also include "advancing frivolous arguments during the course of the litigation or otherwise prolonging litigation in bad faith." *Id.* The frivolous arguments must be shown to be objectively unreasonable at the time they were made. *Id.* (citing *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 567 F.3d 1314, 1339 (Fed. Cir. 2009)).

As discussed above, Plaintiffs brought and maintained claims without knowing the identity of the allegedly omitted inventors, the most basic prerequisite for a successful correction of inventorship patent claim. Viewing the entirety of Plaintiffs' allegations, all of Plaintiffs' causes of action relate in some way to the alleged theft of Plaintiffs' patents; however, Plaintiffs cannot provide sufficient evidence to establish the rightful inventors of the patents. The Court is particularly struck by Plaintiffs' decision to pursue their claims further following Judge Anello's warning that the case would likely be found exceptional based on the evidence before him at the bond hearing. Plaintiffs nevertheless continued with their claims despite Judge Anello's clear indication that there was a serious lack of evidence regarding Plaintiffs' patent claims. Over time, Judge Anello's assessment proved correct and Plaintiffs' claims failed for the reasons he anticipated. The Court finds that Plaintiffs' decision to pursue their patent claims without knowing the identity of the allegedly omitted inventor for such a long period of time, and particularly after Judge Anello's bond order, constitutes litigation misconduct. Furthermore, Defendants' make a persuasive case for finding litigation misconduct based upon Plaintiffs' less-than-honest actions throughout the case.[3] Having already classified the case as

---

[3] Defendants suggest that the following actions should be considered litigation misconduct: (1) Plaintiffs' filed sham affidavits in order to avoid summary judgment; (2) Plaintiffs served incomplete and unverified interrogatory responses without basic investigation regarding the actual identity of the allegedly omitted inventors; (3) Plaintiffs granted a contingent interest in the litigation to a percipient witness; (4) Plaintiffs invited a biased *amicus* brief that was filed on their behalf; (5) Plaintiffs pursued inventorship claims that had no evidentiary support; (6) Plaintiffs pursued claims against Defendants in order to garner outside investments in the litigation; (7) Plaintiffs misled the Court with regard to the location of their headquarters at the time of the bond hearing; (8) Plaintiffs attempted to reallege fraud claims that had previously been dismissed with prejudice; and (9) Plaintiffs alleged 92 patent claims initially but required extensive discovery before narrowing their patent claims to 16. While the Court does not necessarily find that each of these items constitutes litigation misconduct of its own accord, items 2, 5, 6, 7, 8, and 9 raise significant concerns when considering the nature of Plaintiffs' conduct

exceptional based upon Plaintiffs' bad faith in pursuing objectively baseless claims that had no reasonable expectation of success, the Court need not address these individual allegations of litigation misconduct, but notes that the nature of the referenced incidents does not weigh in Plaintiffs' favor. In sum, the Court finds that Plaintiffs brought frivolous claims and engaged in litigation misconduct such that this case is exceptional within the meaning of 35 U.S.C. § 285.

### 2. *Appropriate Amount of Attorneys' Fees*

Having deemed the case exceptional, the second step of the analysis requires the Court to determine whether an award of attorneys' fees is appropriate, and, if so, the amount of the award. *See Forest Labs.*, 339 F.3d at 1328. The authority to award attorneys' fees found in 35 U.S.C. § 285 is limited to the patent side of the case. *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.*, 405 F.2d 288, 297-98 (9th Cir. 1969); *see also Stickle v. Heublein, Inc.*, 716 F.2d 1550, (Fed. Cir. 1983). "Where an action combines both patent and nonpatent claims, the nonpatent issues may in some instances be so intertwined with the patent issues that the evidence would, in large part, be material to both types of issues." *Stickle*, 716 F.2d at 1564.

In this instance, the Court finds that attorneys' fees are warranted under Section 285. Plaintiffs initially alleged 92 patent violations without the requisite evidence to support their claims, never acquired the requisite evidence, and thus caused Defendants to incur several years worth of attorneys' fees in order to oppose Plaintiffs' unsubstantiated claims. For this reason, the Court finds that attorneys' fees under 35 U.S.C. § 285 are appropriate in this instance and will now consider how to properly limit the award of fees to those relating to the patent side of the case as required by the statute.

Plaintiffs' First Amended Complaint ("FAC") contains eleven causes of action. (Doc. No. 14.) Plaintiffs' fifth, sixth, and seventh causes of action for correction of inventorship, declaratory judgment of ownership interest in the patents, and equitable patent infringement are patent claims for which attorneys' fees may be imposed under 35 U.S.C. § 285. (Doc. No. 14 at 30-32.) However, having reviewed the allegations offered as support for the non-patent causes of action, each of Plaintiffs' claims depends upon Plaintiffs' patent-related allegations. For reasons set forth in greater detail below, the Court finds that Defendants are entitled to attorneys' fees under CUTSA for Plaintiffs' misappropriation throughout this action.

claims, which means that the attorneys' fees associated with Plaintiffs' eighth cause of action need not

be separated from the patent fees as they are both independently recoverable.[4]  As to Plaintiffs'

remaining non-patent causes of action, the Court finds that these claims are so intertwined with

Plaintiffs' patent claims and patent-related evidence that the same evidence is material to all of the

issues.[5]  Therefore, the fees associated with these claims may be properly awarded under 35 U.S.C. §

285 as they are virtually inseparable from those fees accrued with regard to the purely patent claims.

Accordingly, the Court awards attorneys' fees associated with Plaintiffs' patent and patent-

related causes of action pursuant to 35 U.S.C. § 285.  The Court will consider the reasonable amount of

the award following the attorneys' fees analysis under CUTSA.

**B. Attorneys' Fees Pursuant to CUTSA, Cal. Civ. Code § 3426.4**

Under Section 3426.4 of the California Uniform Trade Secret Act ("CUTSA"), courts may

award reasonable attorneys' fees to the prevailing party if a claim of misappropriation is made in bad

faith.  Based upon much of the same evidence argued with regard to 35 U.S.C. § 285, Defendants

---

[4] The Court also notes that the discovery related to Plaintiffs' misappropriation claims overlaps significantly with Plaintiffs' patent claims.  Plaintiffs misappropriation claims suggest, among other things, that Defendants incorporated the misappropriated trade secrets into their patent applications.  As a result, the discovery related to Plaintiffs' misappropriation claims required further investigation into Defendants' patents.  (*See* Doc. No. 160 at 1-2 (directing parties to designate up to two of Defendants' patents identified in the Fourth Amended Complaint that are allegedly based upon Plaintiffs' trade secrets and directing Plaintiffs to identify its trade secrets that are allegedly incorporated in the designated patents).)

[5] Plaintiffs' first cause of action alleges that SnapTrack breached the 1999 License Agreement when it, among other things "took ownership of Locate's patents" and "filed patent applications and patents without listing Locate as an assignee or Locate personnel as inventors."  (Doc. No. 14 at 27, ¶ 132.)  Similarly, Plaintiffs' second cause of action makes identical allegations in support for Plaintiffs' alleged breach of the 2006 license agreement claim.  (*Id.* at 28, ¶ 138.)  Plaintiffs' third cause of action alleges fraud and fraudulent inducement based upon SnapTrack "misappropriating Locate's technology and filing patents and patent applications incorporating jointly-owned Program Technology as well as Locate's technology."  (*Id.* at 29, ¶ 142.)  In Plaintiffs' fourth cause of action, Plaintiffs allege tortious interference with contract which alleges that Krasner and Qualcomm "intentionally caused SnapTrack to breach the License Agreement" and, as discussed with the first and second cause of action, the breach of the license agreement claims are based in part upon the alleged patent violations.  (*Id.* at 30.)  Plaintiffs' conversion claim in the ninth cause of action alleges that Defendants "--through their patent filings and other acts -- converted that technology, confidential information, and Program Technology for themselves."  (*Id.* at 34, ¶ 180.)  Plaintiffs' tenth cause of action alleges unfair competition based upon Defendants' misappropriation of Locate's technology and filing "patents and patent applications incorporating Locate's technology and jointly owned Program Technology."  (*Id.* at 35, ¶ 184.)  Lastly, Plaintiffs' eleventh cause of action claims unjust enrichment based upon Defendants misappropriation of Locate's technology "by applying for and obtaining patents based on that technology."  (*Id.* at 35, ¶ 191.)

contend that Plaintiffs pursued frivolous misappropriation claims and engaged in litigation misconduct such that attorneys' fees are warranted under Section 3426.4 of CUTSA.

### 1. Legal Standard

Under Section 3426.4, a prevailing party may recover reasonable attorneys' fees if "a claim of misappropriation is made in bad faith." Cal. Civ. Code § 3426.4. Because CUTSA does not provide a definition of "bad faith" to be used in the context of trade secret misappropriation, California courts have developed a two-pronged standard for the evaluation of such claims. *See SASCO v. Rosendin Elec., Inc.*, 207 Cal. App. 4th 837, 834 (Cal. Ct. App. 2012); *Smith v. Selma Cmty. Hosp.*, 188 Cal. App. 4th 1, 34 (Cal. Ct. App. 2010); *Gemini Aluminum Corp. v. CA Custom Shapes, Inc.*, 95 Cal. App. 4th 1249, 1261 (Cal. Ct. App. 2002). The party seeking an award of attorney's fees under Section 3426.4 must show (1) the objective speciousness of opposing party's claim, and (2) the subjective bad faith of the opposing party in bringing or maintaining the action, that is, for an improper purpose. *Gemini Aluminum Corp.,* 95 Cal. App. 4th at 1261.

With regard to the first prong, objective speciousness "exists where the action superficially appears to have merit but there is a complete lack of evidence to support the claim." *FLIR Sys., Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1276 (Cal. Ct. App. 2009). Objective speciousness may be shown by, among other factors, demonstrating that there was no misappropriation or threatened misappropriation or that the opposing party could not have suffered any economic harm. *Id.* The second prong requiring subjective bad faith is satisfied when it may be inferred from the evidence that a party "intended to cause unnecessary delay, filed the action to harass [the opposing party], or harbored an improper motive." *FLIR Sys., Inc.*, 174 Cal. App. 4th at 1278 (citing *Gemini*, 95 Cal. App. 4th at 1263). "Similar inferences may be made where the plaintiff proceeds to trial after the action's fatal shortcomings are revealed by opposing counsel." *Id.* (citing *Gemini*, 95 Cal. App. 4th at 1264).

### 2. Analysis

Based on its review of the record, the Court concludes Plaintiffs' misappropriation claims were objectively specious and Plaintiffs brought and maintained their claims in subjective bad faith. Here, Plaintiffs did not simply fail to articulate the trade secrets with particularity as an initial matter. Rather, Plaintiffs made seven failed attempts to articulate their trade secrets, requiring Defendants' to participate

in extensive discovery and motion practice before Magistrate Judge Porter and then Magistrate Judge Dembin. (*See* Doc. No. 229.) In Magistrate Judge Dembin's final order describing the lengthy procedural history regarding Plaintiffs' trade secret designations, he notes that "[d]espite seven attempts, Plaintiffs have failed to put forth a designation that provides reasonable notice of the issues for trial and assist the Court in defining the scope of discovery." (*Id.* at 8.) Magistrate Judge Dembin found that Plaintiffs' trade secret designation number one lacked "adequate specificity," and this failure "condemn[ed] the designation to intolerable vagueness." (*Id.* at 8.) Trade secrets number two through ten fared no better as they contained "even less information and more ambiguous terms." (*Id.* at 9.) Despite both Magistrate Judges concluding that "Plaintiffs had failed to designate their trade secrets with sufficient particularity to justify compelling discovery from Defendants" and Judge Anello predicting the misappropriation claims were likely barred by the statute of limitations in addition to lacking the requisite evidentiary connection, Plaintiffs continued to pursue their misappropriation claims.

Plaintiffs contend that failing to sufficiently articulate a trade secret for discovery purposes does not constitute objective speciousness under CUTSA and cites *Pixion, Inc. v. PlaceWare Inc.* as support. 2005 WL 3955890, *2-3 (N.D. Cal. Apr. 22, 2005). In *Pixion*, the defendant argued that, among other things, plaintiff's failure to clearly articulate trade secrets at the pleading stage constituted subjective misconduct. *Id.* The court in that case concluded that plaintiff's decision to maintain its position regarding the adequacy of its trade secret disclosures despite the defendants' evidence otherwise was "hardly evidence of improper motive." *Id.* at *3. Notably, the court in *Pixion* also found that the record was "entirely devoid of evidence of subjective bad faith on plaintiff's part." *Id.* For example, several of plaintiff's trade secrets survived summary judgment, and the court noted that the trade secrets claims arose out of the same set of facts as plaintiff's breach of contract claim, which was clearly not specious. *Id.* However, there are several reasons why the misappropriation claims considered in *Pixion* are distinguishable from Plaintiff's misappropriation claims here. As discussed above, Plaintiffs did not simply fail to articulate trade secret claims at the pleading stage; rather, Plaintiffs unreasonably pursued trade secret claims after having been notified of their evidentiary deficiencies by two magistrate judges and one district court judge. Additionally, Defendants argued, and Judge Anello agreed, that Plaintiffs'

claims were likely barred by the statute of limitations. Despite these significant warnings, Plaintiffs decided to go forward with their misappropriation claims without remedying the deficiencies identified by Defendants, Judge Anello, and Magistrate Judge Dembin. As predicted by Judge Anello, the Court ultimately found that the misappropriation claims were barred by the statute of limitations and granted summary judgment in Defendants' favor. Additionally, unlike the plaintiff in *Pixion* that ultimately had some success on claims that were clearly brought in good faith, the Court has concluded that Plaintiffs' patent claims were objectively baseless and brought in subjective bad faith, and Plaintiffs' misappropriation claims arise out of the same set of facts as the patent claims. For these reasons, *Pixion* does not compare favorably to the facts of this case.

Based on the facts set forth above, the Court concludes that Plaintiffs' misappropriation claims were objectively specious and maintained in subjective bad faith. Plaintiffs received more than sufficient notice regarding the flaws in their claims from Defendants, Magistrate Judge Dembin, and Judge Anello. Knowing the specific shortcomings of their misappropriation claims, Plaintiffs made the decision to go forward despite their inability to sufficiently articulate the alleged trade secrets or overcome Defendants' statute of limitations argument.[6] Accordingly, the Court finds that attorneys' fees are warranted under Section 3426.4 of CUTSA.

### C. Reasonable Amount of Award as to Plaintiffs

As discussed above, attorneys' fees are warranted with regard to Plaintiffs' patent and patent-related claims under 35 U.S.C. § 285 and with regard to Plaintiffs' misappropriation claims under Section 3426.4 of CUTSA. Insomuch as each one of Plaintiffs' claims is covered under the ambit of one of the statutes, the Court need not apportion Defendants' attorneys' fees to the particular cause of action it addressed. As such, the Court will determine the reasonable amount of the award using the lodestar determination.

#### 1. Legal Standard

---

[6] " ' "Bad faith may be inferred where the specific shortcomings of the case are identified by opposing counsel, and the decision is made to go forward despite the inability to respond to the arguments raised.' " *See Gemini Aluminum v. Cal. Custom Shapes*, 95 Cal. App. 4th 1249, 1264 (Cal. Ct. App. 2002) (quoting *Alamar Biosciences, Inc. v. Difco Lab., Inc.*, 1996 U.S. Dist. Lexis 18239, *3 (E.D. Cal. Feb. 23, 1996)

The Supreme Court has developed a two-pronged approach to the calculation of a reasonable attorney's fee. " 'The lodestar determination has emerged as the predominate element of the analysis' in determining a reasonable attorney's fee award." *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996) (quoting *Jordan v. Multnomah County*, 815 F.2d 1258, 1262 (9th Cir. 1987)). Under this approach, a court must first calculate a "lodestar" figure by "multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blum v. Stenson*, 465 U.S. 886, 888 (1984); *see also Cunningham v. County of Los Angeles*, 879 F.2d 481, 484 (9th Cir. 1988), *cert. denied* 493 U.S. 1035 (1990). The lodestar figure is presumptively reasonable. *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992). While this lodestar amount is presumed to represent an appropriate fee, under certain circumstances a court may then adjust the award upward or downward to take into account special factors. *Blum,* 465 U.S. at 897.

### 2. Analysis

Defendants request a total award of $13,465,331.01. This amount is reached by adding the following amounts: $10,244,053 for attorneys fees attributable to lead counsel Cooley LLP ("Cooley"); $391,928.91 for attorneys' fees attributable to document review performed by Black Letter Discovery, Inc. ("Black Letter"); and $2,829,349.10 for fees associated with a document review algorithm generated by outside vendor H5. Neither Plaintiffs nor WHGC objected to the requested amount or the reasonableness of the rates charged and hours spent on the case.[7]

With regard to the attorneys' fees attributable to Cooley, counsel spent 22,921.5 hours on this case in the four years from September 2008 through September 2012. (Karr Decl., Doc. No. 322-2 at ¶ 11; Ex. E, Doc. No. 336-1 at 388.) Based upon the nature of Plaintiffs' claims, the many patents involved in the case, and the length and complexity of the litigation, the Court finds the requested number of hours spent on this case by Cooley to be reasonable. As support for the reasonableness of the rates charged by Cooley attorneys, counsel provided a PeerMonitor Standard Rate Analysis comparing

---

[7] Hughes Hubbard offered generalized objections to the requested amount of attorneys' fees in their opposition to Defendants' motion. However, Defendants withdrew their motion as to Hughes Hubbard, and therefore Hughes Hubbard's objections are moot. To the extent that WHGC filed a notice of joinder in Hughes Hubbard's opposition more than a month after the opposition was filed, the Court finds this objection to be untimely. Regardless, Hughes Hubbard's objections did not provide specific objections to the requested amount such that Court finds that the presumptively reasonable lodestar amount should be adjusted.

14

1    Cooley rates generally to those charged by their peers in Los Angeles, Silicon Valley, San Francisco,

2    and San Diego. (Doc. No. 336.) Overall, Cooley's rates are lower than those charged by comparable

3    firms in California. (*Id.*) Insomuch as neither of the remaining parties objects to the reasonableness of

4    the rates charged by Cooley and the rates appear to be in line with that of the community as supported

5    by the PeerMonitor analysis, the Court finds the requested rates to be reasonable. Accordingly, the

6    requested amount of $10,244,053 represents an appropriate lodestar amount for Cooley's fees.

7         As to Black Letter, Defendants request $391,928.91 in attorneys' fees. The Black Letter

8    attorneys billed a total of 6,949.5 hours of document review at rates of $55 to $67 per hour. As

9    Defendants note in their motion, Plaintiffs' claims involved 92 patents resulting in voluminous

10   document production. For this reason, Cooley reasonably decided to have Black Letter perform

11   document review in this matter. Had Cooley performed the document review themselves, the resulting

12   attorneys' fees would have undoubtedly been exponentially higher than those charged on behalf of

13   Black Letter. In light of the circumstances and the amount of discovery required, the Court concludes

14   that the rates charged and hours spent by Black Letter are reasonable and, thus, finds the resulting

15   lodestar amount of $391,928.91 to be reasonable as well.

16        The third aspect of Defendants' requested fees is $2,829,349.10 attributable to computer-

17   assisted, algorithm-driven document review. Defendants provide the following explanation for the

18   resulting fees: "Over the course of this litigation, Defendants collected almost 12,000,000 records --

19   mostly in the form of Electronically Stored Information (ESI). . . . Rather than manually reviewing the

20   huge volume of resultant records, Defendants paid H5 to employ its proprietary technology to sort these

21   records into responsive and non-responsive documents." (Defs. Mot., Doc. No. 332-1 at 26). After the

22   algorithm determined whether documents were responsive or unresponsive to discovery requests, Black

23   Letter attorneys reviewed the responsive documents for confidentiality, privilege, and relevance issues.

24   (*Id.* at 26, n. 11.) For this reason, the review performed by H5 and Black Letter accomplished different

25   objectives with the H5 electronic process minimizing the overall work for Black Letter. Again, the

26   Court finds Cooley's decision to undertake a more efficient and less time-consuming method of

27   document review to be reasonable under the circumstances. In this case, the nature of Plaintiffs' claims

28   resulted in significant discovery and document production, and Cooley seemingly reduced the overall

fees and attorney hours required by performing electronic document review at the outset. Thus, the Court finds the requested amount of $2,829,349.10 to be reasonable.

Although the Court finds that Defendants' requested lodestar amount reasonably reflects Defendants' attorneys' fees incurred throughout the litigation, the Court may still exercise its discretion in adjusting the overall award upward or downward to take into account special factors. *See Blum,* 465 U.S. at 897. As discussed above, the Court has determined that Plaintiffs pursued objectively baseless claims against Defendants in bad faith. In reaching this conclusion, the Court returned frequently to Judge Anello's bond order issued September 20, 2010, and questioned Plaintiffs' inadvisable decision to continue forward with their claims beyond that point. Following this clear warning that their claims lacked merit, the Court finds it particularly troubling that Plaintiffs maintained their claims for an extended period of time without being able to remedy the evidentiary deficiencies accompanying their claims. Insomuch as the bond order weighed heavily in favor of the Court's decision to impose attorneys' fees, the Court finds it appropriate to limit the imposition of fees to those incurred after the entry of the bond order. At the time of the bond hearing, Defendants' counsel had accrued $1,000,000 in attorneys' fees. Accordingly, the Court reduces the requested amount of $13,465,331.01 by $1,000,000. This results in a total award of attorneys fees in the amount of $12,465,331.01 as against Plaintiffs.

## II. *Defendants' Motion for Attorneys' Fees as to WHGC*

In addition to the statutory requests for attorneys' fees as against Plaintiffs, Defendants seek to hold Plaintiffs' local counsel WHGC liable for Defendants' attorneys' fees as well. Defendants asks that the Court utilize Rule 11 of the Federal Rules of Civil Procedure, or alternatively exercise its inherent authority, to impose sanctions against WHGC for its participation in the case. Under this authority, Defendants ask that WHGC be held jointly and severally liable for the total amount of attorneys' fees requested.

### A. Legal Standard

Rule 11 of the Federal rules of Civil Procedure imposes a duty on attorneys to certify that all pleadings are legally tenable and well-grounded in fact. *See* Fed. R .Civ. P. 11; *Chambers v. NASCO, Inc.*, 501 U.S. 32, 41 (1991). Pursuant to Rule 11(b), attorneys must perform "an inquiry reasonable

16

under the circumstances" to ensure that they have reason to believe that their legal contentions are "warranted by existing law" and that their factual contentions either "have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation." Fed. R. Civ. P. 11(b). When considering alleged Rule 11 violations, the Court utilizes an objective standard of reasonable inquiry which does not mandate a finding of bad faith. *Chambers*, 501 U.S. at 47. Significantly, Rule 11 governs only papers filed with the Court and not alleged litigation misconduct outside of court filings. *See* Fed. R .Civ. P. 11.

However, the court may impose sanctions for general litigation conduct falling outside of the specific prohibitions of Rule 11 through the courts' inherent power. *See Chambers*, 501 U.S. at 51 (finding reliance on inherent powers appropriate where "the conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address"); *Primus Automotive Financial Services, Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997). "The inherent powers of federal courts are those that 'are necessary to the exercise of all others.'" *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980) (quoting *United States v. Hudson*, 7 Cranch 32, 34, 3 L.Ed. 259 (1812)). The most common utilization of inherent powers is the contempt sanction which serves to protect the due and orderly administration of justice and maintain the authority and dignity of the court. *Id.* (citing *Cooke v. U.S.*, 267 U.S. 517, 539 (1925). Courts may exercise their inherent power to impose sanctions in form of attorneys' fees when a losing party has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975) (quotation omitted).

Before awarding sanctions under its inherent powers, the court must make an explicit finding that counsel's conduct "constituted or was tantamount to bad faith." *Roadway Express*, 447 U.S. at 767; *see also Primus*, 115 F.3d at 648. "A finding of bad faith is warranted where an attorney 'knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent.' " *Id.* (quoting *In re Keegan*, 78 F.3d at 436 (citation omitted)). The bad faith requirement sets a high threshold. *Id.*; *see also Mendez v. County of San Bernardino,* 540 F.3d 1109, 1131-32 (9th Cir. 2008).

**B. Analysis**

17

As a general matter, the Court recognizes that local counsel plays a unique role in the litigation process. The local rules require out-of-state attorneys to acquire local counsel, and often local counsel serves primarily in an administrative capacity for the limited purpose of filing documents with the Court. Thus, the reasonable inquiry required for local counsel under Rule 11 may not be the same as that required for lead counsel in many situations. However, Rule 11 remains applicable and sanctions may be imposed against local counsel when appropriate under the circumstances. While it may be reasonable for attorneys to rely on the work conducted by other attorneys in some instances, that determination depends upon whether its reasonable under the particular circumstances.[8]

Here, it is undisputed that WHGC served in a more limited capacity than either of the firms serving as Plaintiffs' lead counsel, Munck Carter PC ("Munck") and subsequently Hughes Hubbard & Reed LLP ("Hughes Hubbard"). WHGC offers the following description of its role in the case as support for finding sanctions unwarranted. As local counsel, WHGC "was asked to, and did, ensure that Plaintiffs' papers met the requirements of the Court's Local Rules and physically filed the papers (either electronically with the Court's ECF system or by hand when documents required under seal treatment)." (WHGC Opp., Doc. No. 354 at 10.) During the initial intake of Plaintiffs' case, WHGC performed legal research to ensure that each of Plaintiffs' claims were properly pled under applicable law and relied upon the assertions of Plaintiffs and Munck that there was a good faith basis for all of Plaintiffs' allegations. (*Id.*) Throughout the case, "WHGC never had access to Plaintiffs' percipient witnesses or to Plaintiffs' documents at the time it was retained to act as Plaintiffs' local counsel." (*Id.* at 11.) Even after Munck left the case and Hughes Hubbard took over as lead counsel, WHGC's role remained unchanged. (*Id.*) WHGC never participated in discovery or motion practice regarding Plaintiffs'

---

[8] *See Qualcomm Inc. v. Broadcom Corp.*, 2008 WL 66932, *16 n. 14 (S.D. Cal. Jan. 7, 2008), *vacated in part by* 2008 WL 636108 (S.D. Cal. Mar. 5, 2008) (noting that sanctions may be imposed on local counsel and that the reasonableness of local counsel's reliance on other attorneys is dependent on the circumstances of the case); *see also Coburn v. Optical Indus., Inc. v. Cilco, Inc.*, 610 F. Supp. 656, 660 n. 7 (D.C. N.C. 1985) (recognizing that "local counsel must be able to rely to some extent on the representations of reputable out of state attorneys, especially when local counsel has no independent knowledge concerning the representations"). *But c.f. Val-Land Farms, Inc. v. Third Nat. Bank in Knoxville*, 937 F.2d 1110, (6th Cir. 1991) (determining that the text of Rule 11 "does not provide a safe harbor for lawyers who rely on the representations of outside counsel" as counsel's obligations under the rule are nondelegable).

08cv1992

1  claims. (*Id.* at 14.)  Based on these facts indicating WHGC's limited role in the proceedings, WHGC

2  contends that it performed an appropriate and reasonable inquiry under the circumstances.

3       In response, Defendants contend that WHGC unreasonably relied upon the representations of

4  lead counsel and Plaintiffs when determining whether Plaintiffs' claims had merit and were brought in

5  good faith.  Moreover, Defendants highlight the fact that WHGC is the sole signatory on the operative

6  Fourth Amended Complaint which WHGC filed to comply with the amendment deadline after Munck

7  left the case and prior to Hughes Hubbard taking over as lead counsel.  (*See* Doc. No. 53.)  Most

8  significantly, Defendants argue that WHGC should have reevaluated its role in the case after it

9  discovered the deficiencies in Plaintiffs' case as set forth by Judge Anello in his bond order some

10  months before.

11       In this instance, although WHGC may have justifiably relied upon Plaintiffs' and Munck's

12  representations as support for its filings prior to Judge Anello's bond order, WHGC has offered no

13  justification for its decision to continue filing documents on Plaintiffs' behalf after Judge Anello warned

14  of the substantial deficiencies in Plaintiffs' case.  As noted above, the order clearly indicated that

15  Plaintiffs' claims were likely unmeritorious, lacked any significant evidentiary support, and appeared to

16  be brought in bad faith.  (*See* Doc. No. 110 at 22.)  Once again, Judge Anello's bond order weighs

17  significantly in favor of the Court's decision to impose sanctions.  WHGC was represented at the

18  hearing, and received electronic notice of the subsequent order.  While WHGC may not have partici-

19  pated in discovery prior to that point, the evidence relevant to the bond order and the Court's interpreta-

20  tion of that evidence should have raised concern.  At that point in time, WHGC's obligation under Rule

21  11 increased as it thereafter became unreasonable to rely on the representations of Plaintiffs and lead

22  counsel when filing documents with the Court.  Even when serving in the more limited role of local

23  counsel, WHGC had an obligation to review Judge Anello's order and undertake a reasonable investiga-

24  tion into the merits of the case.  WHGC did not do so, and instead continued to file documents with the

25  Court without performing the requisite reasonable inquiry under the circumstances.  As such, every

26

27

28

08cv1992

1 WHGC filing after September 20, 2010, was in violation of Rule 11.  Accordingly, the Court finds

2 sanctions to be warranted under Rule 11.[9]

3        With regard to the appropriate amount of Rule 11 sanctions, the sanction must be "appropriate"

4 and "limited to what suffices to deter repetition of the conduct or comparable conduct by others

5 similarly situated."  Fed. R. Civ. P. 11(c)(1), (2).  Defendants ask that the Court hold WHGC jointly and

6 severally liable for the entire amount of Defendants' requested attorneys' fees.  The Court finds this

7 suggestion excessive based on the nature of WHGC's actions and their limited role as local counsel.  It

8 appears that WHGC initially performed a reasonable inquiry under the circumstances, and the basis for

9 finding a Rule 11 violation arises only after the issuance of Judge Anello's bond order.  For this reason,

10 the Court finds that joint and several liability for the entirety of Defendants' attorneys fees is dispropor-

11 tionate to WHGC's violation.  Alternatively, the Court considered limiting WHGC's joint and several

12 liability to those fees billed by Defendants' following the bond order, but concludes that this award

13 would also be excessive under the circumstances.  At the hearing on the instant motion for fees,

14 Defendants' counsel posed a more reasonable alternative.  In their opposition to Defendants' motion for

15 attorneys' fees, WHGC compared the requested $13,465,331.01 in Defendants' attorneys' fees to the

16 $64,316.50 in fees billed by WHGC from the time it was retained in February 2009 through September

17 28, 2012.  (Doc. No. 354 at 9.)  Referencing WHGC's billing total, Defendants suggest that the Court

18 impose sanctions in the amount of $64,316.50, which would, in essence, prevent WHGC from realizing

19 a profit for its services as local counsel in this case.  The Court finds this to be a reasonable method of

20 determining the proper amount of sanctions to be imposed.  This amount should deter local counsel from

21 filing documents without performing a reasonable inquiry under the circumstances, but it is also more

22 appropriate in this instance than basing the award upon Defendants' attorneys' fees incurred following

23 Judge Anello's order.  The lower award is appropriate considering the nature of the violation along with

24 WHGC's limited role in the case.  Accordingly, the Court imposes Rule 11 sanctions against WHGC in

25 the amount of $64,316.50.  This amount shall be awarded to Defendants as attorneys' fees.

---

27        [9] Insomuch as the Court finds sanctions appropriate under Rule 11, the Court need not consider
the imposition of sanctions pursuant to its inherent authority.  However, he Court notes that there
28 appears to be little evidence to support finding bad faith on the part of WHGC sufficient to warrant
sanctions under the Court's inherent authority.

08cv1992

### *Conclusion*

In sum, the Court awards Defendants' $12,401,014.51 in attorneys' fees as against Plaintiffs. Accordingly, the $800,000 bond posted by Plaintiffs and any accrued interest will be distributed to Defendants when this order becomes final. (Doc. No. 121). Plaintiffs will pay the remaining amount of $11,601,014.51 to Defendants. Additionally, the Court awards $64,316.50 in attorneys' fees as against WHGC to be paid to Defendants.

For the reasons set forth above, it is ORDERED that Defendants' Motion for Attorneys' Fees as to Plaintiffs and WHGC be, and it hereby is, GRANTED IN PART and DENIED IN PART. The Court further ORDERS as follows:

1. The Court directs the Clerk of Court to pay the $800,000 in funds and any accrued interest held in the Court's registry to Defendants when this order becomes final;

2. Plaintiffs will pay $11,601,014.51 to Defendants within 60 days of this order; and

3. WHGC will pay $64,316.50 to Defendants within 60 days of this order.

IT IS SO ORDERED.


DATED: February 1, 2013

Hon. Anthony J. Battaglia
U.S. District Judge